

# United States Department of the Interior

## BUREAU OF LAND MANAGEMENT

Eastern States
7450 Boston Boulevard
Springfield, Virginia 22153

JAN 1 0 2011

TO WHOM IT MAY CONCERN;

I HEREBY CERTIFY THAT the attached reproduction(s) is an exact copy of the official document on file in this office.

IN TESTIMONY WHEREOF I have hereunto subscribed my name and caused the seal of this office to be affixed on the above day and year.

Chris Johnson

**Authorized Signature**

ES 1845 1 (June 1993)

No. 35.

The United States of America

To all to whom these presents shall come Greeting.

Whereas, by the act of Congress approved September 28. 1850, entitled "An Act to enable the State of Arkansas and other States to reclaim the Swamp Lands, within their limits," it is provided that all the "Swamp and Overflowed Lands" made unfit thereby for cultivation within the State of Florida, which remain unsold at the passage of said act, shall be granted to said State.

And whereas, in pursuance of instructions from the General Land Office of the United States, the several tracts or parcels of land hereinafter described have been selected as "Swamp and Overflowed Lands" inuring to the said State under the act aforesaid situate, in the District of Lands subject to sale at Gainesville formerly at Tampa, Florida, to wit;

Township 55 South Range 40 East.

All of section one, the North East quarter, the North half of the North West quarter and the East half of the South East quarter of section two, the South half, and the South half of the North West quarter of section three, the North West quarter, the South half of the North East quarter, and the North West quarter of the North East quarter of section four, All of section twelve, the West half, the North East quarter, and the West half of the South East quarter of section thirteen and the North West quarter of section twenty four, containing in all three thousand, two hundred and one acres and fifty three hundredths of an acre.

Township 55 South, Range 41 East

The North half of the North East quarter, the West half of the South East quarter and the East half of the South West quarter of section six, containing in all two hundred and forty acres.

Township 48 South Range 42 East.

The East half of section one, the South East quarter of the North East quarter and the South East quarter of section eleven, the North East quarter of the North East quarter, the West half of the North East quarter, the South half of the North West quarter, the North East quarter of the North West quarter, the West half of the South East quarter and the South West quarter of section twelve, the West half of the North East quarter, the West half of the South East quarter, and the West half of section thirteen, the North East quarter and the East half of the South East quarter of section fourteen, the East half of the North East quarter, the East half of the South East quarter, and the South West quarter of the South East quarter of section twenty three, the West half of the North East quarter, the South East quarter, and the West half of section twenty four, the West half, the North half of the North East quarter, the South West quarter of the North East quarter and the West half of the South East quarter of section twenty five, the East half, and the South East quarter of the South West quarter of section twenty six, the East half and the East half of the North West quarter of section thirty five, and the West half of the North East quarter, the North West quarter, the North half of the South West quarter and the South West quarter of the South West quarter of section thirty six, containing in all four thousand, one hundred and thirty four acres and nineteen hundredths of an acre.

Township 49 South Range 42 East.

The North half, the South East quarter of the South East quarter and the South half of the South West quarter of section eight, the North East quarter of the South East quarter of section nine, the East half of the South East quarter of section twelve, the East half of the North East quarter, the West half of the South East quarter, and the East half of the South West quarter of section thirteen, the North East quarter of the North West quarter, and the South half of the South West quarter of section twenty four, the East half of the North East quarter of section thirty two, and the West half of the North West quarter and the West half of the South West quarter of section thirty three, containing in all one thousand, one hundred and sixty acres.

Township 50 South Range 42 East

Received at Washington D.C. this [illegible] of May 1883 Swamp and [illegible] for the State of Florida of which this is the record [illegible] State Agent for Florida

17 (395[illegible]) [illegible]ent as to the lands described therein. T. 54 & 55 S. R. 42 E.

Township 51 South, Range 42 East,

The lot numbered three, the South half of the North West quarter and the South West quarter of section three, the South half of section Seven, the West half of section ten, the lots numbered one, two, and three of section twelve, the West half of section fifteen, the lots numbered, one, two, three and four, the East half of the South West quarter, the East half of the South West quarter and the East half of section eighteen, the lots numbered one, two three and four, the East half of the North West quarter, the East half of the South West quarter and the East half of section nineteen, the North half of section twenty one, and the lots numbered one and two of section thirty five, containing in all three thousand and eighty eight acres and eighty two hundredths of an acre,

Township 52 South, Range 42 East,

The lot numbered four of section eleven, the South half of the South East quarter of section nineteen, the West half of the North East quarter, the East half of the South East quarter and the West half of section twenty nine, the East half of section thirty, the lots numbered two, three and four, and the East half of the South West quarter of section thirty one, and the West half of the North East quarter and the West half of the North West quarter of section thirty two, containing in all, one thousand, two hundred and ninety eight acres and forty hundredths of an acre,

Township 53 South, Range 42 East,

The lots numbered one, two, three, four, five and six, the South East quarter of the North West quarter, the South East quarter of the North East quarter and the North East quarter of the South West quarter of section six, and the lot numbered four of section nineteen, containing in all four hundred and six acres, and seventy eight hundredths of an acre,

Township 54 South, Range 42 East,

All of fractional sections three, four, ten, and fifteen, the North West quarter of the North East quarter, the North West quarter of the South East quarter and the South West quarter of the South East quarter of section twenty one, the North West quarter of the North East quarter, the East half of the North West quarter, and the South West quarter of section twenty eight, and all of fractional sections thirty two, and thirty three, containing in all one thousand one hundred and three acres and ninety five hundredths of an acre,

Township 55 South, Range 42 East,

All of fractional sections four and five, containing in all one hundred and ninety acres.

Township 43 South, Range 43 East,

The lot numbered four of section three, the South West quarter of the North West quarter of section four, the lots numbered one, two, three, four, nine, ten, eleven and twelve of section five, the lot numbered four of section eight, the lots numbered three and four of section fourteen, the East half of the North West quarter and the East half of the South West quarter of section twenty eight, the North East quarter of the North East quarter and the North West quarter of the South East quarter of section thirty, the East half of the North West quarter, the North West quarter of the North West quarter, and the East half of the South West quarter of section thirty three, containing in all eight hundred and eighty three acres, and ninety three hundredths of an acre,

Township 44 South, Range 43 East,

The North half of section twenty one, the lots numbered one, two, three and four, the East half of the North West quarter and the East half of the South West quarter of section twenty eight, the lots numbered one, four and five of section twenty nine, the lots numbered one and two, the East half, the South West quarter, the East half of the North West quarter and the lots numbered one and two of section thirty three, containing in all one thousand four hundred and eight acres and ten hundredths of an acre,

Township 45 South, Range 43 East,

The lot numbered four, the South West quarter of the North West quarter and the West half of the South West quarter of section four, the lots numbered one, five and eight of section five, the lot numbered one and seven of section eight, the East half, the West half of the North West quarter, and the West half of the South West quarter of section ...

of an acre.

## Township 46 South Range 43 East,

The lots numbered one, two, three and four, the South half of the North East quarter, the South half of the North West quarter, the West half of the South East quarter and the South West quarter of section four, the lot numbered one of section five, the East half of the North East quarter and the North East quarter of the South East quarter of section eight, the West half of the North East quarter and the West half of section nine, the lot numbered two of section ten, the South East quarter of the North East quarter and the South East quarter of section seventeen, the East half and the East half of the South West quarter of section twenty, the West half of the North West quarter and the West half of the South West quarter of section twenty one, the lot numbered two, the West half of the North West quarter and the West half of the South West quarter of section twenty eight, the East half, the East half of the North West quarter and the East half of the South West quarter of section twenty nine, the East half, the East half of the North West quarter and the East half of the South West quarter of section thirty two and the lots numbered one and four of section thirty three, containing in all three thousand, one hundred and eighty four acres and ninety hundredths of an acre.

## Township 47 South Range 43 East,

The lots numbered one, two and three, the South half of the North East quarter, the South half of the North West quarter, and the South half of section five, the lot numbered one, the South East quarter of the North East quarter and the East half of the South East quarter of section six, the East half of the North East quarter and the East half of the North East quarter of section seven, the North East quarter of the North East quarter, the West half of the North East quarter and the West half of section eight, the West half of the North East quarter, the West half of the South East quarter and the West half of section seventeen, the East half of the North East quarter and the North East quarter of the South East quarter of section eighteen, the South West quarter of the South East quarter and the East half of the South East quarter of section nineteen, the North half of the North East quarter and the West half of section twenty, the lots numbered one and two of section twenty one, the West half of the North West quarter and the South West quarter of section twenty nine, the North East quarter, the North West quarter of the South East quarter and the East half of the South East quarter of section thirty, the North East quarter of the North East quarter of section thirty one, and the lots numbered two, the North West quarter and the East half of the South West quarter of section thirty two, containing in all three thousand five hundred and forty eight acres and eleven hundredths of an acre.

## Township 48 South Range 43 East,

The lots numbered eight and the South East quarter of the South West quarter of section five, the lots numbered two, three, four, five, six, and seven, the South half of the North East quarter, the South East quarter of the North West quarter, the North West quarter of the South East quarter and the North East quarter of the South West quarter of section six, the lot numbered one of section seven, the lots numbered one, two, three and four of section eight, the lots numbered one, two, three and four of section eighteen, the lots numbered one and four of section seventeen, the lots numbered one and three of section twenty nine, the lots numbered one and two of section thirty one and the lot numbered one of section thirty two, containing in all, one thousand and fifty eight acres and ninety four hundredths of an acre.

## Township 49 South Range 43 East,

The lots numbered one and two of section five, the lot numbered nine of section six, the lots numbered one and two of section seven, the lots numbered one and two of section eighteen, the East half of the South West quarter of section nineteen, the lots numbered one and five of section thirty, and the lots numbered one and five of section thirty one, containing in all five hundred and twenty three acres and thirty four hundredths of an acre; and containing in the aggregate twelve nine thousand, one hundred and fifty nine acres and forty three hundredths of an acre, according to the official Plat

State of Florida, in fee simple, subject to the disposal of the Legislature thereof, the tracts of lands above described.

To Have and To Hold the same together with all the rights, privileges immunities and appurtenances, thereto belonging, unto the said State of Florida, in fee simple and to its assigns forever.

In testimony whereof I Grover Cleveland President of the United States of America, have caused these letters to be made Patent, and the Seal of the General Land Office, to be hereunto affixed.

Given under my hand at the City of Washington, the 4th day of May in the year of our Lord, one thousand eight hundred and eighty-five and of the Independence of the United States, the one hundred and ninth.

By the President: Grover Cleveland

By M. McLean, Secretary.

L. W. Clark, Recorder of the General Land Office.

CFN # 109827861
OR BK 47671 Pages 435 - 450
RECORDED 01/25/1  01:56:22 PM
BROWARD COUNTY C MMISSION
DEPUTY CLERK 2160
#1, 16 Pages

**RECORDING REQUEST BY:**
**ROSALIE LEE; JENKINS**
**5347 SW 25th Street**
**West Park, FL. 33023-4131**

**WHEN RECORDED, MAIL TO:**
SAME AS ABOVE
**MAIL TAX STATEMENTS TO:**
SAME AS ABOVE

CFN # 109825127
OR BK 47667 Pages 1920 - 1928
RECORDED 01/24/11 01:11:11 PM
BROWARD COUNTY COMMISSION
DEPUTY CLERK 1012
#1, 9 Pages

**SPACE ABOVE FOR RECORDER'S USE ONLY**

---

## DECLARATION OF ASSIGNEE'S UPDATE OF PATENT
## PATENT NUMBER 1694338-3

Know All Men by These Presents: That Rosalie Lee; Jenkins and Michael L. Bell
do severally Certify and Declare that (We/I) bring up this Land Patent in Rosalie Lee; Jenkins.

   **(1) The character of said property so sought to be patented.**

And legally described and referenced under Patent Number listed above
is: Lots 1 and 2 in block 50 of REVISED Plat of CARVER RANCHES according to plat thereof,
recorded in plat book 21, Page 8 of the Public Recording of Broward County, Florida.

   **(1) Notice of Pre-emptive Right.** Pursuant to the Declaration of Independence [1776], the Treaty
of Peace with Great Britain (3 Stat. 80)**, known as the Treaty of Paris [1793], an** Act of Congress
[3 Stat. 566. April24,1820], the Oregon Treaty [9 Stat. 869. June 15, 1846], the Homestead Act
[12 Stat. 392. 1862] and 43 USC Sections 57, 59, and 83; **the recipient hereof is mandated by
Art. VI Sections 1, 2, and 3; Art. IV Sections I Cl. 1. & 2; Section 2 Cl. 1 & 2; Section 4; the 4th,
7th, 9th, and 10th Amendments [U.S. Constitution, 1781-91] to acknowledge assignee's update
of patent prosecuted by authority of Art. III Section 2 Cl. 1 & 2 and enforced by
original/exclusive jurisdiction there under and it is the only way a perfect title can be had in our
names,** Wilcox v. Jackson, 13 pet. (U.S.) 498, 10 I, ed. 264: **all questions of fact decided by the
general land office are binding everywhere, and injunctions and mandamus proceedings will not
lie against it,** Litchfield v. The register, p wall. (U.S.) 575, 19 l. Ed. 681. **This document is**
instructed to be attached to all deeds and/or conveyances in the name(s) of the above party(ies)
**as requiring recording of this document, in a manner known as nunc pro tunc [as it should have
been done in the beginning], by order of United States supreme law mandate as endorsed by case
history cited.**

   **(2)Notice and Effect of a Land Patent. A grant of land is a public law standing on the statute
books of the Florida, and is notice to every subsequent purchaser under any conflicting sale made
afterward;** Wineman v. Gastrell, 54 Fed 819, 4 CCA 596, 2 US App 581. **A patent alone passes
title to the grantee;** Wilcox v. Jackson. 13 Pet (U.S..) 498, 10, l. Ed. 264. **When the United States
has parted with title by a patent legally issued, and upon surveys legally made by itself and
approved by the proper department, the title so granted cannot be impaired by any subsequent**
survey made by the government for its own purposes; Cage v. Danks, 13, La. Ann, 128, **in the
case of ejectment, where the question is who has the legal title, the patent of the government is
unassailable,** Sanford v. Sanford, 139 US 642. **The transfer of legal title (patent) to public**

②

**domain gives the transferee the right to possess and enjoy the land transferred,** Gibson v. Chouteau, 80 US 92. **A patent for land is the highest evidence of title and is conclusive as evidence against the government and all claiming under junior patents or titles,** United States v. Stone, 2 US 525, **estoppels has been maintained as against a municipal corporation (county),** Beadle v. Smyser, 209 US 393, *until it issues, the fee is in the government, which by the patent* **passes to the grantee, and he is entitled to enforce possession in ejectment, Bagnell v. Broderick,** 13 Peter (US) 436. State statutes that give lesser authoritative ownership of title than the patent **cannot even be brought into federal court,** Langdon v. Sherwood, 124 US 74, 80, **the power of congress to dispose of its land cannot be interred with, or its exercise embarrassed by any state legislation; nor can such legislation deprive the grantees of the United States of the possession and enjoyment of the property granted by reason of any delay in the transfer of the title after the** initiation of proceedings for its acquisition. [Gibson v. Chouteau, 13 Wal. (U.S.) 92,93.

(3) *Land title and transfer the existing system of land transfer is a long and tedious process* **involving the observance of many formalities and technicalities. A failure to observe any one of** which may defeat the title. Even where these have been most carefully compiled with, and **where the title has been traced to its source, the purchaser must be at his peril. There always** being, in spite of the utmost care and expenditure, the possibility that this title may turn out bad: **Yeakle Torrence System 209. Patents are issued (and theoretically passed) between** Sovereigns Leading Fighter vs. County of Gregory, 230 NW2d 110, 116. **The patent is prima facie conclusive evidence of title,** Marsh vs. Brooks, 49 US 223.233. **An estate in inheritance without condition, belonging to the owner and alienable by him, transmissible to his heirs absolutely and simply, is an absolute estate in perpetuity and the largest possible estate a man can have, being in fact allodial in its nature,** Stanton vs. Sullivan, 63 RI 216 7 A, 696. **The original meaning of a** perpetuity is an inalienable, indestructable interest. Bouvier's law dictionary, Volume III p. 2570 **(1914) if this land patent is not challenged, as stated above, within 60 days it then becomes** our/my property, as no one else has followed the proper steps to get legal title, the final certificate of receipt acknowledging the payment in full by a homesteader or preemptor is not **legal effect a conveyance of land.** U.S. vs. Steenerson, 50 Fed 504, 1 CCA 552, **4 US. App. 332. A land patent is conclusive evidence that the patent has complied with the act of congress as concerns improvements on the land, etc.** Jankins vs. Gibson, 3 LA Ann 203

**(4) Law on Rights, Privileges, and Immunities; Transfer by Patentee ...... "Title and Rights of** Bona Fide Purchaser from Patentee..... Will Be Protected. United States vs. Debell, 227 F 760 (C3 Sd. 1915), **United States vs. Beamon.** 242 F 876. (Ca8 Colo. 1917): State vs. Hewitt Land Co., 74 Wash 573, 134 P 474. From **43 Usc & 15 N 44.** As an Assignee, Whether He Be the **First, Second or Third Party to Whom Title Is Conveyed Shall Lose None of the Original Rights, Privileges or Immunities of the Original Grantee of Land Patent. "No State Shall Impair the Obligations of Contracts". United States Constitution Artical I Section 10**

**(5) Equal Rights: Privileges and Immunities Are Further Protected under the 14th Ammendment to the U.S. Constitution, "No State..... Shall Deny to Any Person Within its Jurisdiction the Equal** Protection of the Laws". In Case of Ejectment, Where the Question Is Who Has the Legal Title. The Patent Of the Government Is Unassailable, Sanford vs. Sanford, 139 U.s. 642, 35 L Ed 290. In Federal Courts the Patent Is Held to Be the Foundation of Title at Law. Fenn v. Holmes, 21 Howard 481. **Immunity from** Collateral Attack: Collins vs. Bartlett, 44 Cal 371; Weber vs. Pere

Marquette Boom Co., 62 Mich 626, 30 N.W. 469; Surget v. Doe, 24 Miss 118; Pittsmont Copper Co. v. Vanina, 71 Mont, 44, 227 Pac 45; Green Vs. Barker 47 Neb 934 66 NW 1032

**(6) Disclaimer; Assignee's Seizen in Deed, and Lawful Entry Is Inclusive of Specifically That Certain Legally Described Portion of the Original Land Grant or Patent No. 1694338-3 And Not the Whole Thereof, Including Hereditament, Tenements, Pre-emption Rights Appurtenant Thereto. The Recording of this Instrument Shall Not Be Construed to Deny or Infringe upon Any Others Right to Claim the Remaining Portion Thereof. Any Challenges to the Validity of These Declaration & Notice Are Subject to the Limitations References Herein.**

Additionally; a Common Courtesy of Sixty (60) Days Is Stipulated for Any Challenges Hereto, Otherwise, Laches/estoppel Shall Forever Bar the Same Against Allodial Freehold Estate; Assessment Lien Theory to the Contrary (Ors 275.130), Included

The Following Documents Are Attached to this Declaration, Certified Copy of Original Land Grant or Patent, Declaration of Homestead (Strike out If Not Applicable), Legal Description of Portion of Said Grant or Patent.

**IN WITNESS WHEREOF, I have hereunto set my hand and seal this**
____20____ day of ___JANUARY_____ , 2011 at , _5347 S.W. 25th ST., WEST PARK FL._
**Florida.**
____ROSALIE LEE·JENKINS  UCC 1-308____ , Trustee

**State of Florida**

**County of Broward}  S.S.**

On this __20__ day of __January__ , in the year of 2011, before me, _____,
personally appeared _Rosalie Lee Jenkins_ , personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed this instrument.

**WITNESS my hand and official seal.**

_____
Notary Public, State of Florida

NOTARY PUBLIC-STATE OF FLORIDA
Glendon Tucker, Jr.
Commission # DD873398
Expires:  MAR. 23, 2013
BONDED THRU ATLANTIC BONDING CO., INC.

**My Commission expires** _March 23, 2013_

**PREPARED BY: ROSALIE LEE; JENKINS**
**WHEN RECORDED MAIL TO:**
**ROSALIE LEE; JENKINS**
**5347 SW 25th STREET**
**WEST PARK, FL. 33023-4131**

## EXHIBIT "A"
## DECLARATION OF LAND PATENT

### UNITED STATES LAND PATENT NO.1694338-3 ISSUED ON THE 6 DAY

OF January. BY Barack Hussein Obama, PRESIDENT OF THE UNITED STATES OF
AMERICA.*

### KNOW ALL MEN BY THESE PRESENTS:

THAT WE, ROSALIE LEE; JENKINS DO JOINTLY CERTIFY AND DECLARE THAT WE
BRING UP THIS LAND PATENT IN OUR NAME, PROPERTY SO SOUGHT TO BE
PATENTED, AND LEGALLY DESCRIBED AND REFERENCED UNDER PATENT
NUMBER ___1694338-3___ LISTED ABOE I S : 5347 S.W. 25th St.
_WEST PARK, FL. 33023-4131_.
BROWARD COUNTY RECORDS BEING A PART OF THE _____
SECTION 19, TOWNSHIP 51 SOUTH, RANGE 42 EAST
MERIDIAN,
BROWARD COUNTY, FLORIDA.
NO CLAIM IS MADE HEREIN THAT CLAIMANT HAS BEEN ASSIGNED THE ENTIRE
TRACT OF LAND DESCRIBED IN THE ORIGINAL PATENT. THIS ASSIGNMENT IS
INCLUSIVE ONLY OF THE ABOVE LEGAL DESCRIPTION. THE FILING OF THIS
DECLARATION OF LAND PATENT SHALL NOT DENY OR INFRINGE ON ANY RIGHT
PRIVILEGE OR IMMUNITY ANY OTHER ASSIGNEE TO ANY OTHER PORTION OF
LAND COVERED IN THE ABOVE DESCRIBED LAND PATENT NUMBER 1694338-3.

WE, ROSALIE LEE; JENKINS AND MICHAEL L. BELL DO SWEAR AND STATE THAT
THE ABOVE IS TRUE OR IS BELIEVED, BY US TO BE TRUE AND CORRECT TO THE
BEST OF OUR ABILITY AND KNOWLEDGE.
X _Rosalie Lee; Jenkins UCC 1-308_ , CLAIMANT
X _Michael Bell_ , CLAIMANT
STATE OF FLORIDA
COUNTY OF BROWARD
ON _January 20_, 2011, BEFORE ME, THE UNDERSIGNED, A NOTARY PUBLIC IN
AND
FOR THE STATE, PERSONALLY APPEARED _Rosalie Lee; Jenkins UCC 1-308_
AND _Michael Bell_ KNOWN BY ME TO BE THE INDIVIDUALS WHOSE
NAMES ARE SUBSCRIBED TO THE WITHIN INSTRUMENT, AND ACKNOWLEDGED
TO THAT THEY EXCECUTED THE SAME.
WITNESS MY HAND AND OFFICIAL SEAL _Glen Tucker_



NOTARY PUBLIC-STATE OF FLORIDA
Glendon Tucker, Jr.
Commission # DD873398
Expires: MAR. 23, 2013
BONDED THRU ATLANTIC BONDING CO., INC.

**NOTARY PUBLIC, STATE of FLORIDA**

**DECLARATION OF HOMESTEAD**

I/We, _ROSALIE LEE· JENKINS   UCC 1-308_ **Do Hereby Declare**
That My/Our Mailing Address For My/Our Homestead Is: 5347 SW 25th ST., West Park, FL.
33023-4131.

I/We Am/Are Now Residing On The Land and Premises Located In The City Of West Park,
**County of Broward State of Florida, Know And Legally Describe As Follows:**

Lots 2 in block 50 of REVISED Plat of CARVER RANCHES according to plat thereof, recorded
in plat book 21, Page 8 of the Public Recording of Broward County, Florida.

I/We Hereby Declare and Claim Said Premises As A Homestead.

No Further Declaration of Homestead Has Been Made By Me/Us Except As Has Be
**Abandoned.**

Date: _01/20/11_     X _Rosalie Lee Jenkins  UCC 1-308_
                     X _Michael J Bell_

**State Of Florida SS.**
**County Of Broward**
I/We, _GLENDON TUCKER, JR._ , Being Duly Sworn On Oath, Deposes
And Says: That as Signer To This Declaration of Homestead, All Statements
Made Herein Are True and Correct, To The Best Of My/Our Knowledge And
Belief. Subscribed and Sworn To Before Me,
This _20_ Day of _January_ 2011.

                                        _Glen Tucker_
                                        Notary Public, State of Florida

NOTARY PUBLIC-STATE OF FLORIDA
Glendon Tucker, Jr.
Commission #DD873398
Expires: MAR. 23, 2013
BONDED THRU ATLANTIC BONDING CO., INC.

Commission Expires _March 23, 2013_

January 20, 2011

ROSALIE LEE; JENKINS
C/O 5347 SW 25th STREET
WEST PARK, FL. 33023-4131
NON DOMESTIC

BROWARD COUNTY COMMISSION DEPUTY CLERK
CIRCUIT COURT OF BROWARD COUNTY
BROWARD COUNTY SEAT, FLORIDA

DEAR ROSALIE LEE; JENKINS

ON January 24, 2011 I RECORDED A DECLARATION OF LAND PATENT
WITH THE RECORDER'S OFFICE AS INSTRUMENT # _16_ SEE ENCLOSED COPY.

RECENTLY, I RECEIVED A TAX BILL FOR THE AMOUNT OF $1,463.91 SEE
ENCLOSED COPY. THIS MUST BE A MISTAKE. MY DECLARATION OF LAND
PATENT IS SUPERIOR TITLE TO THAT HELD BY THE STATE.

"THAT THE PATENT CARRIES THE FEE AND IS THE BEST TITLE KNOWN TO
A COURT OF LAW IS THE SETTLED DOCTRINE OF THE COURT." Marshall v.
Ladd, 74 U.S. 106.
"A PATENT IS THE HIGHEST EVIDENCE OF TITLE, AND IS CONCLUSIVE,
AGAINST THE GOVERNMENT AND ALL CLAIMING UNDER JUNIOR TITLE.
UNTIL IT IS SET ASIDE OR ANULLED BY SOME JUDICIAL TRIBUNAL." Stone
v. U.S., 67 U.S. 765.
"ISSUANCE OF A GOVERNMENT PATENT GRANTING TITLE TO LAND IS
THE MOST ACCREDITED TYPE OF CONVEYANCE KNOWN TO OUR LAW."
U.S. v. Cherokee Nation 474 F.2d 628, 634.

LAND CANNOT BE TAXED IF A LAND PATENT IS CURRENT. I AM NOT A TENANT.
I HEREBY REVOKE YOUR POWER OF ATTORNEY AND WITHDRAW MY CONSENT
FOR YOU TO TAX ME BASED UPON THE VALUE OF MY LAND. PLEASE LOOK
INTO THIS MATTER IMMEDIATELY.

SINCERELY, ALL RIGHTS RESERVED WITHOUT PREJUDICE, U.C.C. 1-207 & 1-308
ROSALIE LEE; JENKINS

**Tax Bill Refusal Letter**

January 20, 2011

Rosalie Lee; Jenkins
c/o 5347 SW 25th Street
West Park, FL. [33023-4131]
NON DOMESTIC

**BROWARD COUNTY COMMISSION DEPUTY CLERK**
**CIRCUIT COURT OF BROWARD COUNTY**
**[BROWARD COUNTY SEAT, FLORIDA]**

DEAR SIR:

ON January 24, 2011 I RECORDED A DECLARATION OF LAND PATENT
WITH THE RECORDER'S OFFICE AS INSTRUMENT # _16_ SEE ENCLOSED COPY.

RECENTLY, I RECEIVED A TAX BILL FOR THE AMOUNT OF $1,463.91 SEE
ENCLOSED COPY. THIS MUST BE A MISTAKE. MY DECLARATION OF LAND
PATENT IS SUPERIOR TITLE TO THAT HELD BY THE STATE.

"THAT THE PATENT CARRIES THE FEE AND IS THE BEST TITLE KNOWN TO
A COURT OF LAW IS THE SETTLED DOCTRINE OF THE COURT." Marshall v.
Ladd, 74 U.S. 106.

"A PATENT IS THE HIGHEST EVIDENCE OF TITLE, AND IS CONCLUSIVE,
AGAINST THE GOVERNMENT AND ALL CLAIMING UNDER JUNIOR TITLE,
UNTIL IT IS SET ASIDE OR ANULLED BY SOME JUDICIAL TRIBUNAL." Stone
v. U.S., 67 U.S. 765.

"ISSUANCE OF A GOVERNMENT PATENT GRANTING TITLE TO LAND IS
THE MOST ACCREDITED TYPE OF CONVEYANCE KNOWN TO OUR LAW."
U.S. v. Cherokee Nation 474 F.2d 628, 634.

LAND CANNOT BE TAXED IF A LAND PATENT IS CURRENT. I AM NOT A TENANT.
I HEREBY REVOKE YOUR POWER OF ATTORNEY AND WITHDRAW MY CONSENT
FOR YOU TO TAX ME BASED UPON THE VALUE OF MY LAND. PLEASE LOOK
INTO THIS MATTER IMMEDIATELY.

ALL RIGHTS RESERVED WITHOUT PREJUDICE, U.C.C. 1-207 & 1-308

SINCERELY,

(Rosalie Lee; Jenkins)

**BROWARD COUNTY, FLORIDA 2010** REAL ESTATE NOTICE OF AD VALOREM TAXES AND NON - AD VALOREM ASSESSMENTS

| ACCOUNT NUMBER | ESCROW CODE | ASSESSED VALUE | EXEMPTIONS | TAXABLE VALUE | MILLAGE CODE |
|---|---|---|---|---|---|
| 514219-02-1170 | | 75,370 | **SEE BELOW** | **SEE BELOW** | 3513 |

· **Prior Year(s) Taxes Due**   Legal Description:

GRIER,ROSALIE JENKINS
5347 SW 25 ST
WEST PARK, FL
          33023

CARVER RANCHES REV PLAT 21-8 B
LOT 2 BLK 50

## AD VALOREM TAXES

| TAXING AUTHORITY | MILL RATE | ASSESSED VALUE | EXEMPTION VALUE | TAXABLE VALUE | TAXES LEVIED |
|---|---|---|---|---|---|
| BROWARD COUNTY COMMISSION | | | | | |
| COUNTYWIDE SERVICES | 5.1021 | 75,370 | 50,500 | 24,870 | 126.89 |
| VOTED DEBT | 0.4509 | 75,370 | 50,500 | 24,870 | 11.21 |
| BROWARD CO SCHOOL BOARD | | | | | |
| CAPITAL OUTLAY | 1.5000 | 75,370 | 25,500 | 49,870 | 74.81 |
| GENERAL FUND | 6.1310 | 75,370 | 25,500 | 49,870 | 305.75 |
| SO FLORIDA WATER MANAGEMENT | | | | | |
| EVERGLADES C.P. | 0.0894 | 75,370 | 50,500 | 24,870 | 2.22 |
| OKEECHOBEE BASIN* | 0.2797 | 75,370 | 50,500 | 24,870 | 6.96 |
| SFWMD DISTRICT | 0.2549 | 75,370 | 50,500 | 24,970 | 6.34 |
| S BROWARD HOSPITAL | 1.2732 | 75,370 | 50,500 | 24,870 | 31.66 |
| CHILDREN'S SVCS COUNCIL OF BC | 0.4696 | 75,370 | 50,500 | 24,870 | 11.68 |
| CITY OF WEST PARK | 8.5000 | 75,370 | 50,500 | 24,870 | 211.40 |
| FL INLAND NAVIGATION | 0.0345 | 75,370 | 50,500 | 24,870 | 0.86 |

| | TOTAL MILLAGE | 24.0853 | | TOTAL AD VALOREM TAXES | 789.78 |
|---|---|---|---|---|---|

## NON - AD VALOREM ASSESSMENTS

| LEVYING AUTHORITY | AMOUNT |
|---|---|
| WEST PARK FIRE | 298.52 |
| WEST PARK SOLID WASTE | 390.40 |
| | |
| TOTAL NON- AD VALOREM ASSESSMENTS | 688.92 |

| SEE REVERSE SIDE FOR IMPORTANT INFORMATION | **COMBINED TAXES AND ASSESSMENTS** | | | | **1,478.70** |
|---|---|---|---|---|---|
| **IF PAID BY** | Nov 30, 2010 | Dec 31, 2010 | Jan 31, 2011 | Feb 28, 2011 | Mar 31, 2011 |
| **PLEASE PAY** | **$1,419.55** | **$1,434.34** | **$1,449.13** | **$1,463.91** | **$1,478.70** |

REAL ESTATE                                      **FOLIO / ALT KEY:**   779890
**BROWARD COUNTY, FLORIDA 2010** NOTICE OF AD VALOREM TAXES AND NON - AD VALOREM ASSESSMENTS

1000000000000000000000000007798902010000001478700000000000001

**MAKE CHECKS PAYABLE TO:**
**BROWARD COUNTY TAX COLLECTOR**
**P.O.BOX 29009**
**FORT LAUDERDALE, FL 33302-9009**

| ACCOUNT NUMBER |
|---|
| 514219-02-1170 |
| 7 7 9 8 9 0 |

GRIER,ROSALIE JENKINS
5347 SW 25 ST
WEST PARK, FL
          33023

| IF PAID BY | PLEASE PAY |
|---|---|
| Nov 30, 2010 | **$1,419.55** |
| Dec 31. 2010 | **$1,434.34** |
| Jan 31, 2011 | **$1,449.13** |
| Feb 28, 2011 | **$1,463.91** |
| Mar 31, 2011 | **$1,478.70** |

**PLEASE PAY ONLY ONE AMOUNT**
**Prior Year(s) Taxes Due**

NOTICE TO THE COURT: **Counter Demand**

January 20, 2011
Circuit Court of Broward County
201 se 6th Street
Ft. Lauderdale, FL. 333011

RE: NOTICE TO THE COURTS AND ALL EMPLOYEES OF THE STATE OF
FLORIDA AND ANY OF ITS COUNTIES AND ANY OF ITS CITIES:

COUNTER-DEMAND

DEAR SIR:

YOU ARE HEREBY INSTRUCTED BY THIS CITIZEN TO PROVIDE ME WITH
THE FOLLOWING REQUIRED INFORMATION PURSUANT TO U.C.C. 3-504.4 AND
RETURN IT TO ME. IN THE ENCLOSED STAMPED ENVELOPE.

EXHIBITION OF THE INSTRUMENT THAT CREATED THE LIABILITY.
REASONABLE IDENTIFICATION OF THE PERSON MAKING PRESENTMENT AND
EVIDENCE OF HIS AUTHORITY TO MAKE IT. IF MADE FOR ANOTHER: AND.
THAT THE INSTRUMENT BE PRODUCED FOR ACCEPTANCE OF PAYMENT AT
A PLACE SPECIFIED IN IT, OR IF THERE BE NONE, AT ANY PLACE REASONABLE
IN THE CIRCUMSTANCES, AND
A SIGNED RECIEPT OF THE INSTRUMENT FOR ANY PARTIAL OR FULL
PAYMENT AND ITS SURRENDER ON FULL PAYMENT.

FAILURE TO COMPLY WITH ANY SUCH REQUIREMENTS INVALIDATES THE
PRESENTMENT. THE PERSON PRESENTING HAS A REASONABLE TIME IN
WHICH TO COMPLY AND THE TIME FOR ACCEPTANCE OR PAYMENT RUNS
FROM THE TIME OF COMPLIANCE.

*U.C.C. 3-505.5*
THE PRESENTER OR HIS AUTHORIZED AGENT MAY TREAT THE PRESENTMENT
AS DISHONORED IF THE PERSON TO WHOM THE PERSENTMENT IS MADE
ROSALIE LEE; JENKINS MAKES COUNTER-DEMANDS WHICH ARE NOT
AUTHORIZED BY U.C.C. 3-505.4 OR PLACES UNREASONABLE CONDITIONS ON
DEMANDS AUTHORIZED BY THIS SECTION.

IF THE COUNTER-DEMAND BY ROSALIE LEE; JENKINS ARE PROPER, THE PRESENTER MUST COMPLY WITH THEM, AND THE CODE GIVES A REASONABLE TIME IN WHICH TO RESPOND. CORRESPONDINGLY. UNTIL THERE IS SUCH COMPLIANCE, THERE IS NOT
FURTHER DUTY UPON THE OTHER PERSON TO WHOM PRESENTMENT IS MADE ROSALIE LEE; JENKINS AND THE TIME FOR ACCEPTANCE OR PAYMENT RUNS FROM THE TIME OF COMPLIANCE.

YOU HAVE (10) CALENDAR DAYS FROM RECIEPT OF THIS COUNTER-DEMAND IN WHICH TO RESPOND TO THIS COUNTER DEMAND, OTHERWISE I WILL CONSIDER THE MATTER CLOSED AND THE PRESENTMENT VOID AB INITIO.
IF YOU DO NOT ANSWER THIS COUNTER DEMAND THEN YOU HAVE CONCURRED WITH MY DECLARATIONS AND TESTIMONY IN THIS MATTER. THIS COUNTER DEMAND SHALL BE ENTERED INTO THE OFFICIAL RECORD OF ANY AND ALL PROCEEDINGS ARISING OUT OF THIS MATTER, AND SHALL BE PRESENTED AS EVIDENCE IN A COURT OF LAW.

THANK YOU,


Rosalie Lee; Jenkins
c/o 5347 SW 25th St.
West Park, FL. 33023-4131
NON-DOMESTIC

**STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM**

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON

B. SEND ACKNOWLEDGMENT TO:
Name: c/o ROSALIE LEE JENKINS
Address: 5347 SW 25th Street
Address: United State of America
City/State/Zip: West Park, FL. 33023

**FLORIDA SECURED TRANSACTION REGISTRY**

**FILED**
2010 Jul 19 10:33 AM
****** 201002887303 ******

CFN # 109514393
OR BK 47294 Pages 252 - 253
RECORDED 08/16/10 11:52:45
BROWARD COUNTY COMMISSION
DEPUTY CLERK 1033
#1, 2 Pages

1. DEBTOR'S EXACT FULL LEGAL NAME - INSERT ONLY ONE DEBTOR NAME (1a or 1b)

1a. ORGANIZATION'S NAME
1b. INDIVIDUAL'S LAST NAME: ROSALIE LEE JENKINS

1c. MAILING ADDRESS Line One: 5347 SW 25th STREET | CITY: WEST PARK | STATE: FL | POSTAL CODE: 33023 | COUNTRY: USA

1d. TAX ID# | 1e. TYPE OF ORGANIZATION: ENS Legis/land | 1f. JURISDICTION OF ORGANIZATION: PRIVATE | 1g. ORGANIZATIONAL ID#: NONE

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - INSERT ONLY ONE SECURED PARTY (3a OR 3b)

3b. INDIVIDUAL'S LAST NAME: JENKINS | FIRST NAME: ROSALIE | MIDDLE NAME: LEE | SUFFIX:
3c. MAILING ADDRESS Line One: 5347 SW 25th Street | CITY: West Park | STATE: FL | POSTAL CODE: 33023 | COUNTRY: USA

4. This FINANCING STATEMENT covers the following collateral:

5. ALTERNATE DESIGNATION (if applicable): [✓] AG. LIEN

6. Florida DOCUMENTARY STAMP TAX
[✓] Florida Documentary Stamp Tax is not required.

7. OPTIONAL FILER REFERENCE DATA 7/14/10

STANDARD FORM - FORM UCC-1 (REV 04/2008) | Filing Office Copy | Approved by the Secretary of State, State of Florida

# SUN–SENTINEL
### PUBLISHED DAILY
### FORT LAUDERDALE, BROWARD COUNTY, FLORIDA
### BOCA RATON, PALM BEACH COUNTY, FLORIDA
### MIAMI, MIAMI-DADE COUNTY, FLORIDA

STATE OF FLORIDA
COUNTY OF BROWARD/PALM BEACH/MIAMI-DADE

BEFORE THE UNDERSIGNED AUTHORITY, PERSONALLY APPEARED
LINDA HALL, WHO, ON OATH, SAYS THAT SHE IS A DULY
AUTHORIZED REPRESENTATIVE OF THE CLASSIFIED DEPARTMENT
OF THE SUN-SENTINEL, DAILY NEWSPAPER PUBLISHED IN
BROWARD/PALM BEACH/MIAMI-DADE COUNTY, FLORIDA, THAT
THE ATTACHED COPY OF ADVERTISEMENT, BEING A:

### NOTICE

THE MATTER OF:

#### RE: UDATED LAND PATENT

IN THE CIRCUIT COURT, WAS PUBLISHED IN SAID NEWSPAPER IN THE
ISSUES OF:

FEBRUARY 24, 25, 26, 2011                               13969057

AFFIANT FURTHER SAYS THAT THE SAID SUN-SENTINEL IS A NEWSPAPER
PUBLISHED IN SAID BROWARD/PALM BEACH/MIAMI-DADE COUNTY, FLORIDA,
AND THAT THE SAID NEWSPAPER HAS HERETOFORE BEEN CONTINUOUSLY
PUBLISHED IN SAID BROWARD/PALM BEACH/MIAMI-DADE COUNTY, FLORIDA,
EACH DAY, AND HAS BEEN ENTERED AS SECOND CLASS MATTER AT THE POST
OFFICE IN FORT LAUDERDALE, IN SAID BROWARD COUNTY, FLORIDA, FOR A
PERIOD OF ONE YEAR NEXT PRECEDING THE FIRST PUBLICATION OF ATTACHED
COPY OF ADVERTISEMENT: AND AFFIANT FURTHER SAYS THAT SHE HAS NEITHER
PAID, NOR PROMISED, ANY PERSON, FIRM. OR CORPORATION, ANY DISCOUNT,
REBATE, COMMISSION, OR REFUND, FOR THE PURPOSE OF SECURING THIS
ADVERTISEMENT FOR PUBLICATION IN SAID NEWSPAPER.

_____
(SIGNATURE OF LINDA HALL, AFFIANT)

SWORN TO AND SUBSCRIBED BEFORE ME
ON 03 MARCH 2011, A.D.

_____
(SIGNATURE OF NOTARY PUBLIC)

JULIEANN C. ROSSI
Notary Public - State of Florida
My Comm. Expires Apr 18, 2013
Commission # DD 855420
Bonded Through National Notary Assn.

(NAME OF NOTARY, TYPED, PRINTED, OR STAMPED)

PERSONALLY KNOWN ( X ) OR PRODUCED IDENTIFICATION (   )

NOTICE
January 10, 2011 a updated land
patent Township 51, range: 42
east, section: 19 Knows as Lot 1
and 2 in Block 50 of Revised Plat of
Carver Ranches.
February 24, 25, 26, 2011

IN THE CIRCUIT COURT OF THE SEVENTEENTH
JUDICIAL CIRCUIT OF FLORIDA IN AND FOR
BROWARD COUNTY
GENERAL JURISDICTION DIVISION
CASE NO. 09-33770 CACE 13

DEUTSCHE BANK NATIONAL TRUST
COMPANY, AS TRUSTEE FOR THE
CERTIFICATEHOLDERS OF SOUNDVIEW
HOME LOAN TRUST 2006-OPT5, ASSET-
BACKED CERTIFICATES, SERIES 2006-
OPT5,

     Plaintiff,

vs.

**NOTICE OF VOLUNTARY DISMISSAL**

ROSALIE JENKINS A/K/A ROSALIE L.
JENKINS A/K/A ROSA LEE GRIER;
UNKNOWN SPOUSE OF ROSALIE
JENKINS A/K/A ROSALIE L. JENKINS
A/K/A ROSA LEE GRIER; UNKNOWN
TENANT #1; UNKNOWN TENANT #2,

     Defendants.

_____

Please take notice that Plaintiff, DEUTSCHE BANK NATIONAL TRUST COMPANY, AS
TRUSTEE FOR THE CERTIFICATEHOLDERS OF SOUNDVIEW HOME LOAN TRUST 2006-
OPT5, ASSET-BACKED CERTIFICATES, SERIES 2006-OPT5, pursuant to the provisions of Fla.
R. Civ. P. 1.420, has voluntarily dismissed the above styled action without prejudice and hereby
instructs the Clerk of this Court to cancel the Lis Pendens previously filed herein against the
property legally described as:

LOT(S) 2, BLOCK 50, OF REVISED PLAT OF CARVER RANCHES, ACCORDING TO THE
PLAT THEREOF, AS RECORDED IN PLAT BOOK 21, PAGES 8, OF THE PUBLIC RECORDS
OF BROWARD COUNTY, FLORIDA.

I HEREBY CERTIFY that a true copy of this Notice was delivered to the attached mailing
list by mail this December 15, 2009

Ben-Ezra & Katz, P.A.
Attorneys for Plaintiff
2901 Stirling Road, Suite 300
Fort Lauderdale, Florida 33312
Telephone:   (305) 770-4100
Fax:   (305) 653-2329

By
   Cheryl L. Burm
   Fla. Bar No. 527777

Sarah M. Barbacca
FBN 30043

Our file 71963 | jan
N:\docs\fcl\VOLDIS.doc

**MAILING LIST**

CRAIG A. SACKLER, Esq.
Attorney for
POST OFFICE BOX 1656
DEERFIELD BEACH, FL, 33443

UNKNOWN TENANT #1
5347 SW 25 ST,
WEST PARK, FL 33023

5.       There has been a default under the note and mortgage held by Plaintiff in that the payment due March 1, 2009, and all subsequent payments have not been made.

6.       Plaintiff declares the full amount due under said note and mortgage to be now due.

7.       There is now due, owing and unpaid to Plaintiff herein ONE HUNDRED NINETY-FOUR THOUSAND EIGHT HUNDRED EIGHTY-SEVEN AND 99/100 ($194,887.99) in principal of said note and mortgage, interest as provided therein from February 1, 2009 and title search expense for ascertaining necessary parties to this suit.

8.       Plaintiff has obligated itself to pay the undersigned attorney a reasonable fee for his services herein. Both the note and the mortgage provide for an award of attorney's fees incurred by Plaintiff for enforcement thereof in the event of a default by the borrower.

9.       All conditions precedent to the filing of this action has been performed or has occurred.

10.       As spouse of the property owner, Unknown Spouse of ROSALIE JENKINS A/K/A ROSALIE L. JENKINS A/K/A ROSA LEE GRIER may claim an interest in the property being foreclosed. Any such interest is subordinate and inferior to the lien of the mortgage being foreclosed herein.

11.       Unknown tenant #1 may claim an interest in the property being foreclosed by virtue of his or her occupancy of the property. Any such interest is subordinate and inferior to the lien of the mortgage being foreclosed herein.

12.       Unknown tenant #2 may claim an interest in the property being foreclosed by virtue of his or her occupancy of the property. Any such interest is subordinate and inferior to the lien of the mortgage being foreclosed herein.

WHEREFORE, Plaintiff demands judgment foreclosing the mortgage and such other relief as is just and proper in the premises, including the entry of a deficiency judgment, if appropriate.

## COUNT II
### REESTABLISHMENT OF PROMISSORY NOTE

13.       This is an action to reestablish a Promissory Note pursuant to Section 71.011 and 673.3091, Florida Statutes.

14.       On March 24, 2006 at Broward County, Florida, a Promissory Note and Mortgage were executed and delivered by ROSALIE JENKINS A/K/A ROSALIE L. JENKINS A/K/A ROSA LEE GRIER, in favor of MARINERS CAPITAL, INC. in the principal amount of $200,000.00.

15.       The subject Promissory Note has been lost or destroyed and is not in the custody or control of the Plaintiff who is the owner and holder of the subject Note and Mortgage and its whereabouts cannot be determined. Plaintiff neither has any knowledge as to when the subject

CACE12007647-11



**A TRUE COPY**

NOV 26 2019

BRENDA D. FORMAN
CLERK OF THE COUNTY COURT R. 07/13
BROWARD COUNTY, FL
Provisional

DR-452
R. 07/13
**Provisional**
Effective 01/14

# RETURN OF REAL PROPERTY IN ATTEMPT TO ESTABLISH
## ADVERSE POSSESSION WITHOUT COLOR OF TITLE
### Section 95.18, Florida Statutes

DEPARTMENT OF REVENUE

### THIS RETURN DOES NOT CREATE ANY INTEREST ENFORCEABLE BY LAW IN THE DESCRIBED PROPERTY

For residential structures, a person who occupies or attempts to occupy a residential structure solely by claim of adverse possession prior to making a return, commits trespass under s. 810.08, F.S. A person who occupies or attempts to occupy a residential structure solely by claim of adverse possession and offers the property for lease to another commits theft under s. 812.014, F.S.

#### COMPLETED BY ADVERSE POSSESSION CLAIMANT

The person claiming adverse possession (claimant) must file this return with the property appraiser in the county where the property is located as required in s. 95.18(1), F.S.

| Name of claimant(s) | ROSALIE LEE JENKINS | | |
|---|---|---|---|
| Mailing address | 5347 S.W. 25th ST. WEST PARK, FL. [33023] | Phone | 954-549-5643 |
| | | Parcel ID, if available | 514219021170 |
| | | ☒ the property claimed is only a portion of this parcel ID 514219021170 | |
| Date of filing | 11/22/2019 | Date claimant entered into possession of property | 01/15/2019 |

**Legal description of property claimed**
Must be full and complete. If the property appraiser cannot identify the property from the legal description, you may be required to obtain a survey. Lot (2) Block (50) of Revised of CARVER RANCHES According to the Plat Thereof AS Recorded in Plat Book (21), Page (8) of the Public Records of BROWARD County, Florida.

| This property has been: (Check all that apply.) | ☐ protected by substantial enclosure | ☒ cultivated, maintained, or improved in a usual manner |
|---|---|---|

Describe your use of the property, in detail below.

Occupied, Maintained, Rehab, and Remodel.

Dates of payments of any outstanding taxes or liens levied by the state, county or municipality: 11/22/2019

Under penalty of perjury, I declare that I have read the foregoing return and that the facts stated in it are true and correct. I further acknowledge that the return does not create any interest enforceable by law in the described property.

Signature of claimant(s)  ROSALIE LEE JENKINS

State of Florida
County of BROWARD

This instrument was sworn to and subscribed before me on 11/22/19 by ROSALIE LEE JENKINS

personally known to me or who produced Passport as identification.

ELLEN STEWART
Commission # FF97125
Commission Expires 03-30-2020
Bonded Through - Commentary
Public - Notary Public

Signature and seal, notary public

#### COMPLETED BY PROPERTY APPRAISER

Received in the office of the property appraiser of Broward County, Florida, on 11/22/19
A signed copy of this return has been delivered to the claimant(s). A copy will be sent to the owner of record.

Signature, property appraiser or deputy                11/22/19 & Same date
Date

#### TO THE OWNER OF RECORD

A tax payment made by the owner of record before April 1 the year after the taxes were assessed will have priority over a payment made by the claimant. An adverse possession claim will be removed if the owner of record or tax collector furnishes a receipt to the property appraiser showing payment of taxes by the owner of record during the period of the claim. (S. 95.18, F.S.)

This return is a public record and may be inspected by any person under s. 119.01, F.S.

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

Deutche Bank National Trust Company
**Plaintiff/Petitioner**

CASE# 12 00 7647-11

VS.

**Division** 11

Rosa Lee Grier et al
**Defendant/Respondent**

A TRUE COPY

SEP 21 2021

## NOTICE OF FILING

( ) **Plaintiff/Petitioner**          ( )**Defendant/Respondent**

This is Homeowners Legal Rights

_____

_____

_____

_____

_____

( )**Plaintiff/Petitioner**          ( )**Defendant/Respondent**

Signature: Rosalie L. Jenkins-Bey

Address: 5347 S. W. 25th ST.

City, State, Zip: West Park FL. 33023

Phone: 954-549-5643

# HOMEOWNERS LEGAL RIGHTS, INC.

## 5347 S.W. 25th TREET
## WEST PARK, FLORIDA 33023
### Advocating For Homeowners in All 50 States and All U. S. Territories

### September 20, 2021
### CASE NO: CACE-12007647-11

TO Chief Justice of the United States Supreme Court John Roberts
TO the Chief Justices of all SO State Supreme Courts

### RE: Notice of Demand for Due Process and Justice

Your Honors: Andrea Gundersen

Homeowners Legal Rights, Inc. (HLR), is a Florida charitable corporation operating under 26 U.S.C. § 501(c)(3). Our mission is, in part, to educate the public about the unconstitutional taking of fundamental rights to life, liberty and property without due process of law in foreclosure cases and to advocate for the preservation and restoration of the due process rights of the people by reminding government officials of their duty to uphold the law.

HLR recognizes that under our form of Government, the GOD-given rights of We the People are to be safe-guarded in all judicial proceedings.

HLR is gravely concerned and wishes to bring to your attention that a multitude of citizens have experienced a systematic lack of regard or disregard for due process rights, in both courts of law and equity, by the judicial system in foreclosure proceedings brought against American Homeowners. We are informed by reliable sources that, due to the moratoriums ordered during the COVID-19 National Emergency, approximately Two Million (2,000,000) homes may be subject to foreclosure when the moratoriums are due to be lifted on or about July 31, 2021.

It is our position that:

1)      Every private landowner of record, who appears in a court proceeding, is entitled to have the right to ownership of property constitutionally protected by the courts under the due process clauses of the Fifth Amendment to the *Constitution of the United States of America* made applicable to the States pursuant to Section 1 of the Fourteenth Amendment.

     2)    Judges of all courts are required to provide due process to litigants who appear before them.

     3)    Further, every judge presiding over a foreclosure case must do so with full knowledge and understanding of the April 4, 2012 National Consent Judgments[1] which was entered into by State and Federal Regulators, U. S. Department of Justice, and 49 State Attorney Generals with what were then the five (5) largest mortgage servicing companies in the nation.

     4)    All courts need to recognize that most of the legal violations reported in the Consent Judgments referenced above are of laws specifically created and designed to protect the owners of record recorded in the public land records from **financial ruin** and **homelessness** as the result of the filing of false documents in the public land records and false pleadings and motions in judicial proceedings which are supported by forged and falsely sworn documents.

     In order for any court to have jurisdiction to hear a foreclosure case in judicial proceedings, the party seeking the equitable remedy of foreclosure must have standing to proceed, including clean hands. We wish to provide you with full knowledge of the Consent Judgments to assure that every bank, servicer, debt collector and their attorneys, proceeding before the court as representatives of alleged lenders, comply with applicable laws to establish their standing and to deny relief if false documents to support their claims of standing are presented to the court under the equitable doctrine of unclean hands. See, e.g., *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240 (1933) at page 244.

     The acceptance of an offer for loan funding by a Homeowner is not consideration and does not relieve the originator or alleged owner of the debt or their alleged representative(s) from the obligation to present evidence of consideration to the court. Consideration cannot be established by false documents. Failure to require evidence of consideration and/or proof of payment of value for enforcement of the security interest creates the opportunity for unlawful self-enrichment of interlopers, intruders who self-proclaim standing without authentic and genuine proof. Courts throughout the nation have turned a blind eye to the activities of interlopers and intruders proceeding on false evidence and have allowed rampant unlawful trespass of land, equity rights and constitutional rights.

---

[1] The April 4, 2012 Consent Judgments were most recently retrieved on June 16, 2021 and are retrievable at

http://www.nationalmortgagesettlement.com/files/Consent_Judgment_Ally-4-11-12.pdf
http://www.nationalmortgagesettlement.com/files/Consent_Judgment_BoA-4-11-12.pdf
http://www.nationalmortgagesettlement.com/files/Consent_Judgment_Citibank-4-11-12.pdf
http://www.nationalmortgagesettlement.com/files/Consent_Judgment_Chase-4-11-12.pdf
http://www.nationalmortgagesettlement.com/files/Consent_Judgment_WellsFargo-4-11-12.pdf

The United States of America and all of the separate States guarantee a republic form of government. The *Constitution of the United States of America* was established by **We the People**[2] for **the People** and governed by **the People**. We hold ourselves out to be the Judges of Justice itself. We have determined after close examination of prior foreclosures and the aforementioned Consent Judgment, that many courts have carelessly and irresponsibly rendered Americans homeless and forfeited the ownership rights to millions of homes in violation of the principles of contract law and contrary to the principles of equity.

On behalf of **the People**, HLR therefore requests that you assure that the rights of land ownership are preserved and restored in accordance with the founding constitutional protections and established laws.

On behalf of **the People**, HLR requests you hold banks, their officers and agents accountable as established by the United States Department of Justice, Office of the Comptroller of Currency and the Consumer Financial Protection Bureau, for violation of banking and securities laws and financial accounting rules as set forth in the Consent Judgment of April 4, 2012.

HLR reminds you that the Constitution for the United States of America guarantees under the 5th Amendment the right of each citizen to Life, Liberty and Property. The origin of the 5th Amendment is Section 39 of the Magna Carta (1215) which provides:

"No free man is to be arrested, or imprisoned, or disseised, or outlawed, or exiled, or in any other way ruined, nor will we go against him or send against him, except by the lawful judgment of his peers or by the law of the land."

We are confident that you will honor your oaths of office and proceed in compliance with the *Constitution for the United States of America* and the laws of the United States of America, the constitutions of the respective states and the established principles of law.

We commend to your attention, the attached Open Letter dated September 18, 2020 retrievable at
https://deadlyclear.com/2020/09/18/an-open-letter-to-president-donald-j-trump-hud-secretary-ben-carson/
which exemplifies the long-standing issues with which you should be familiar.

---

[2] Preamble to the *Constitution of the United States*.

3

May God grant the peace which passes all understanding to your souls and show you the mercy that you have not shown to American Homeowners, who have thus far endured deprivations of their constitutionally protected rights under your watch.

Acquiescence shall be termed as acceptance.

Thank you for your attention to our concerns.

Respectfully submitted,

E-signature */s/Rosalie Lee Jenkins-Bey*

Linda A. Nash
CEO Homeowners Legal Rights, Inc.

Attachment: As stated above
cc:

Speaker of the US House of Representatives, Nancy Pelosi
House Minority Leader Kevin McCarthy
Senate Majority Leader Charles Schumer
Senate Minority Leader Mitch McConnell
United States President, Joseph Biden
United States Attorney General Merrick Garland

VIA EMAIL ONLY TO:
Governors of all 50 States
Attorneys General of all 50 States
Presidents of the Senates of all 50 States
Media Representatives to be contacted

# <u>Deadly Clear</u>

**Foreclosure defense. Proficient legal & litigation assistant, researcher keeping homeowners & legislators informed. It's not about me – it's about all of us.**

# An Open Letter to President Donald J. Trump & HUD Secretary Ben Carson

Posted on September 18, 2020

Regarding the 2020 Foreclosure & Eviction Moratorium

By Sydney Sullivan

For nearly a dozen years, we have followed the securitization/rehypothecation crisis and corruption on behalf of over 200 million American Homeowners (2.5 per HH) and their families. It's been a tough 12 years and some families are still fighting fraudulent bank foreclosures since 2009. Can you even imagine a lawsuit and the threat of losing your home for over a decade, waking up every morning wondering when the sheriff is coming to throw you, your family and your belongings out on the street?

Thank you in advance for considering our plight. We applaud your "Moratorium" on evictions and foreclosures and the extension which you added just this week – but Sirs, it's very limited. It doesn't reach a lot of people that are in dire need and let us tell you why.

Your moratorium is limited to FHA loans. It should be open to all homeowners with mortgages after 2002 (if not before) given the depth of corruption in the industry. Most of the loans started off "originally" in the newer (circa 2000) ramped up version of securitization/rehypothecation as FHA, or GSE (Government Sponsored Enterprises – Fannie & Freddie) backed loans. Now, we all know that GSEs weren't really the government, nevertheless securitization at the turn of the century was designed and patented for fraud and foreclosure – unbeknownst to most Americans.

Legislators and Judges were spoiled rancid by their retirement portfolio investments that were filled with Mortgage-Backed Securities (MBS) – an obvious appearance of impropriety and conflict that was ignored. Smear campaigns had filled the fake news airwaves that homeowners were irresponsible and "bought more than they could afford" when in reality the American homeowners were sold mortgages like stock shares. Mortgages were given on what the borrower would agree to pay and appraisals were intentionally inflated to meet the value needed for the banks and ultimately – Fannie Mae.

Fannie even patented the process of "willingness to pay" versus actual real estate value. Of course, the sales pitch to the homeowner was, "your house is appraised at $600,000 so you can refinance and pull out $200,000 and buy a second home" (or a boat, or take a trip, send the kids to college – whatever the

kicker was to hook the fish). "Land prices have always escalated for the last 70 years," another bankster narrative.

*Wall Street Wolfs were everywhere – your neighbors, relatives, lodge brothers, church members – all* people you thought you could trust. And frankly, they probably had no idea what these bank executives and financiers were doing in their ivory towers or the overall intent.

> The Wolfs were only in it to make money and the paperwork was sloppy, if not in some cases, criminally forged.

These loans were not traditional mortgages. As Sheila Bair (former FDIC chair and author of Bull By The Horns) called them – they were NTMs. Non-Traditional Mortgages. There was nothing "traditional" about these loans. They were abusive, patented foreclosure software for scams (the intent is in the USPTO patents) that should never have fallen under the state and federal statutes of a traditional mortgage because they were anything but. These were securities *before* the homeowners ever signed the faux documents. The procedure was designed to trash the Chain of Title.

**But let's get back to your moratorium for "FHA loans."**

It appears that a great majority of loans started out as GSE guarantees. However, the GSEs participated in a nationwide predatory mortgage lending scheme, a complex confidence game that led the Department of Justice ("DOJ") to file suit against Bank of America, et. al., its former (Countrywide) and current subsidiaries and partners, on October 24, 2012. Due to the nature of the DOJ case, documents were originally sealed, some were released though many remain sealed today.

The overall DOJ case did not completely resolve until May 23, 2016. The case publicly unleashed the secret that subprime loans by large mortgage companies such as Countrywide and New Century Mortgage Corporation ("NC") sold and pledged their
procured loans to Fannie Mae and Freddie Mac.

> "Fannie Mae and Freddie Mac purchase single-family residential mortgages from lenders" (Intervenor Complaint, ¶18). "GSEs buy single-family mortgages from mortgage companies and other financial institutions [. . .] then either hold the loans in their investment portfolios or bundle them into mortgage-backed securities ("MBS") that they sell to investors." (Intervenor Complaint, ¶27)"
>
> *USA v. BofA, et. al., USDC Southern District of NY, 12 Civ. 1422 (JSR) (Oct. 2012), Complaint-In-Intervention of the USA ("Intervenor Complaint").*

During this period, numerous other governmental agencies filed suits relating to the mortgage crisis. Until their resolutions were recently made public, it was impossible for American Homeowners to adequately defend against the judicial foreclosure and sale process. As government related lawsuits and consent orders evolved it established the intentional cover up of countless frauds against homeowners in an ongoing pattern of complicity.

*Homeowner "mortgage" loans were primarily sold by a local brokers through large subprime* companies like New Century and Countrywide to Federal National Mortgage Association ("Fannie"), who was a facilitator of securitized loans with its own securitization pools that were deliberately

impossible to find; intentionally not listed in the Securities and Exchange Commission ("SEC") and even hidden on Bloomberg Terminal.

Fannie's involvement began in the overall scheme started before the turn-of-the century and became paramount with the use of Fannie patented software "1003 loan application process." However, from the inception of loans primarily after 2003, FANNIE'S ROLE WAS INTENTIONALLY CONCEALED. Pursuant to Fannie's 2008 Servicing Guidelines:

"**Fannie Mae is at all times the owner of the mortgage note,** *whether the note is in Fannie Mae's portfolio or whether owned as trustee, for example, as trustee for an MBS trust. In addition, Fannie Mae at all times has possession of and is the holder of the mortgage note, except in the limited circumstances expressly described below.*"

In March 2007, Fannie severed business ties with New Century. This meant New Century could no longer sell loans to Fannie. This also meant homeowners with New Century loans would have difficulty finding where their loans had traveled. Assignments of Mortgages were only created and filed when the homeowner defaulted. If the homeowner didn't default and wanted to find his loan, only the original recorded copy of the mortgage existed. New Century thereafter entered into a liquidating trust, New Century TRS Holdings Inc. bankruptcy, Case No. 07-104416 (KJC) on April 2, 2007 – and thus, the great paper shuffle ensued.

In one such case, the homeowner filed a claim in the New Century bankruptcy only to be told that New Century did not own the loan. It had been sold to Lehman Brothers Bank in 2006. That's where the New Century file stopped. Lehman Brothers Bank had no files on the loan and its parent company, Lehman Brother Holding Company, Inc. had filed bankruptcy in September 2008 (the Great Crash). It too also had no files.

Other than an obviously manufactured fraudulent assignment of mortgage from New Century to a U.S. Bank Trustee in 2009 (well after the NC bankruptcy) crafted without authorization or acknowledgment of the New Century Liquidating Trust Trustee – who, BTW, had already provided the homeowner with an affidavit that New Century had sold the loan to Lehman Brothers Bank in 2006 – the Plaintiff (U.S. Bank) had no other evidence of standing to pursue a foreclosure. The circuit court judge in the foreclosure case ignored all the evidence, including New Century Trustee's affidavit and New Century's bankruptcy court clarification in an order as provided in exhibits by the homeowner – and ruled in favor of the bank plaintiff. The case is still on appeal.

"Fannie collaborated with numerous banks to commit identical deception programs" on countless homeowners. Fannie had instituted the relaxed underwriting program in 2006, now known as Expanded Approval ("EA"). This allowed subprime lenders like New Century and Countrywide's "hustle" to sell riskier loans to Fannie. The Securities and Exchange Commission (SEC) Complaint against the GSE's executives filed on December 16, 2011 states:

"Fannie Mae did not tell investors that in calculating the Company's exposure to subprime loans reported in this filing, Fannie Mae again did not include at least $43 billion of EA loans, included loans from only fifteen loan originators of the approximately 210 lenders listed on the HUD Subprime Lender list, and did not even have the capacity to track

whether loans were originated by a subprime division of a large lender"(SEC Complaint, ¶7).

*SEC Complaint v. Fannie Mae Executives, 11 CIV 9202, filed Dec. 16, 2011*

Until March 20, 2007, New Century was one of the "Fannie Fifteen" loan originators. "By February 2007, following S&P's downgrade of high-profile subprime lender, New Century Financial Corporation, and other indicia of subprime market turmoil-including HSBC Holdings PLC's announcement that the U.S. subprime market was unstable-investors were increasingly focused on subprime loans and the risks associated with these loans" (See SEC Complaint, ¶81).

### Ethics panel examines lawmakers' Countrywide loans

By June 2008, Countrywide Financial Corp. was feeling the heat and cooking with Congressional lawmakers.

A Congressional ethics panel began examining allegations that two Senate Democrats, including the sponsor of a major housing bill, received preferential loans by troubled mortgage lender Countrywide Financial Corp. "Friends of Al" refinances popped up all over Washington, DC and throughout state legislatures, when average American Homeowners couldn't even get a modification. Friends of Al also surfaced in the halls of the Hawaii Legislature. Mazie Hirono even provided a special Countrywide phone number to her constituents that called with foreclosure problems.

*"Sen. Christopher Dodd of Connecticut and Sen. Kent Conrad of North Dakota have acknowledged that they refinanced properties as members of Countrywide's VIP program."*

Countrywide, which was in the process of being acquired by Bank of America, was one of several mortgage companies under federal investigation.

So, here we are with two major wholesale lenders (among others) under federal investigation, one of which, Countrywide, was schmoozing Congressional representatives. In addition, complicit GSEs were helping them to "Hustle" homeowners with relaxed underwriting guidelines ...and along comes Barry and Tim.

As the mortgage world begins to collapse, credit freezes and Lehman Brothers fails, Barack Obama and Tim Geithner begin to **"Foam the Runway"** for the banks by creating the fake HAMP program that is carried on TV, radio & newsprint inducing homeowners to call to get a modification.

Neil Barofsky, who gave up his job in 2008 as a prosecutor in the U.S. Attorney's Office in New York City where he had convicted drug kingpins, Wall Street executives, and perpetrators of mortgage fraud, to become the special inspector general in charge of oversight of the spending of the TARP bailout money explains it in detail in his book . Bailout

TARP – the program American homeowners thought Congress and former President Obama had constructed for their rescue. Wrong.

Mr. Barofsky writes early on that "I had no idea that the U.S. government had been captured by the banks," and at another point describes his strategy to use the press to get the attention of Congress, and by extension an obstreperous Treasury: **"Our message was simple: Treasury's desperate attempt to bail out Wall Street was setting the country up for potentially catastrophic losses.""**

Mr. Barofsky continues, "One particularly pernicious type of abuse was that servicers would direct borrowers who were current on their mortgages to start skipping payments, telling them that they would allow them to qualify for a HAMP modification. The servicers thereby racked up more late fees, and meanwhile many of the borrowers might have been entitled to participate in HAMP even if they had never missed a payment. Those led to some of the most heartbreaking cases. Homeowners who might have been able to ride out the crisis instead ended up in long trial modifications, after which the servicers would deny them a permanent modification and then send them an enormous "deficiency" bill."

We knew there was an intended systemic abuse with the modification programs.

Too many people told the **same stories**. However, we didn't know why the government, our President and Congress, would allow such abuses but after you read Chapter 8 – it becomes quite clear. Geithner and Obama were saving the banks – not America.

**"Making matters worse,"** Mr. Barofsky writes, **"Treasury all but paved the way for outright fraud by ignoring my recommendations that it kick off HAMP with a broad nationwide television and radio advertising campaign that would educate homeowners about program details and warn them of the dangers of program-related fraud. [. . .] They failed to do so, and, as I had predicted, the chaos of HAMP lured a host of criminal predators running fraudulent advertisements for "guaranteed Obama modifications" from coast to coast." ... including Hawaii and Alaska.**

Meanwhile, back at the GSE ranch – Fannie, Freddie and the banks (and a litany of questionable attorneys and document companies) were crafting Assignments of Mortgages by the 10s of thousands – more likely millions. Robo-signers galore forged documents in the millions.

One case where the homeowner is still fighting for his home and currently (at this very moment) facing eviction was another New Century Mortgage origination from January 2007, that had 5 **different mortgage assignments** (sales/transfers), 5 **different banks** and 6 **different servicers** in a short period of time. A major paper shuffle that has confused all parties including the courts. In fact, the last assignment occurred during the foreclosure process and the assignee was never named in the foreclosure complaint. At no time did any of the 6 servicers advise the homeowner that they worked for Fannie. That wasn't discovered until research into to the servicers' 10Ks identified FMNA as their primary account.

This case is extremely gruesome because the property has been in the homeowner's family for 100 years. The case and its manipulation is much too complicated for average attorneys and lower court judges with no securities experience. The five assignments of mortgage apparently confused all including opposing counsel, the foreclosure commissioner, the homeowner's counsel, and the courts.

The foreclosure complaint was filed on **August 19, 2014** and included 4 of the 5 Assignments of Mortgage. Here are some of the highlights of this case:

The first assignment of mortgage is the breeder document from which all the following assignments are derived, was manufactured by or for America's Servicing Company (ASC) aka Wells Fargo and dated **November 4, 2009** and notarized on **November 4, 2009**. The document assigned the mortgage to **HSBC Bank USA**. It was signed by well-known robo-signer Lorrie Womack as Asst. Sec. for Mortgage Electronic Registration Systems, Inc.(MERS) as Nominee for New Century Mortgage Corporation. Below – the document on the right belongs to this homeowner. The document on the left is a clone and was filed at the same time – one number off to someone else on another island.

The documents are merely the same – only the names are changed – robo-signing fraud.

This deceptive breeder assignment fails for several reasons, primarily because New Century was in a liquidating bankruptcy and as of **April 25, 2008**, by order of the bankruptcy court, was no longer associated with MERS. The homeowner presented all of the documented evidence, but the lower Hawaii circuit court ignored the entire argument – it appears, so did the attorney that took over his case. Hawaii courts routinely ignored robo-signing and forgery in foreclosure cases. Bankruptcy court orders also carried no weight – even if the there was no legal authorization for the creation of the assignment.

On February 5, 2016, the Board of Governors of the Federal Reserve System (FRS) issued an Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended ("FRS Order") against HSBC North America Holdings, Inc. NY, for its deceptive and failed business practices with regard to mortgage loans from **January 1, 2009 to December 31, 2010**. Stating, pgs. 2-3, in part:

> "**Filed or caused to be filed in state courts [. . .] or in the local land record offices, numerous affidavits and other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary; Litigated foreclosure [. . .] without always confirming that documentation of ownership was in order at the appropriate time, including confirming that the promissory note and mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party;**

> HSBC NY case no. 12-011-CMP-HC

HSBC settled with FHFA (GSE Conservatorship) for \$550 million. The suit on behalf of Fannie and Freddie accused bank of misrepresenting toxic subprime MBS that helped send the pair into conservatorship. The HSBC corruption matching the breeder assignment of mortgage document apparently didn't phase the court either. The judge conveniently over-looked the corruption documentation.

At one point during this fiasco, both Wells Fargo and HSBC were trying to collect on this loan at the same time, sending the homeowner confusing letters shortly after he had been advised to skip 3 payments in order to qualify for HAMP. Throughout the process the homeowner, a former police officer, tried numerous times to get a HAMP modification through ASC to no avail.

**If ever there was a poster child for foreclosure and mortgage securitization corruption – this is it!** (and these are only the highlights)

The plaintiff in this foreclosure case is US BANK TRUST, NATIONAL ASSOCIATION AS TRUSTEE FOR **WG2 MORTGAGE TRUST VII, SERIES 2013-1** (the 4th assignment of mortgage from WG1 Mortgage Trust VII through Morgan Stanley Mortgage Capital Holdings LLC) and Saxon Mortgage Services to WG2.

In late 2010, another servicer, Saxon Mortgage Services, Inc. (Saxon) took over the loan indicating a new loan number. Every servicer changed the loan number without notice, of course making it even harder to track even by professionals. Saxon also entered into a <u>Commitment to Purchase Financial Instrument and Servicer Participation Agreement</u> with the U.S. Treasury and FANNIE on September 24, 2010 which was terminated for cause by Fannie on April 9, 2013. The timing of Saxon servicing issues correlates with the Federal Reserve Board announcement on April 2, 2012 issuing a **Consent Order against Morgan Stanley to address a pattern of misconduct and negligence in residential mortgage loan servicing and foreclosure processing at its subsidiary, Saxon.**

Then followed Specialized Loan Servicing ("SLS"), who also entered into a Commitment to Purchase Financial Instrument and Servicer Participation Agreement with the U.S. Treasury and FANNIE on January 13, 2010 replacing the previous servicer.

> All of the homeowner's loan servicers entered into these Fannie **Servicer Participation Agreements** to modify loans which were in full force and effect as they serviced the loan.
>
> *https://www.treasury.gov/initiatives/financial-stability/TARP-Programs/housing/mha/Pages/contracts.aspx*



FEDERAL HOUSING
FINANCE AGENCY

## PUBLIC AFFAIRS

FHFA Fund Update on Private Label Securities Arrears



Contacts

By December 30, 2013, Wells Fargo & Co agreed to pay $335.23 million to Fannie to settle claims of **fraud and deception over defective home loans** – IN PRIVATE LABEL SECURITIES (PLS). In February 2014, Morgan Stanley agreed to pay FHFA $1.25 Billion to settle a lawsuit that it sold mortgage bonds to Fannie and Freddie without adequately disclosing their risks.

On November 19, 2013, enters another servicer, LenderLive Network Inc. ("LenderLive"), that took over the loan servicing until October 26, 2014. LenderLive was an "Approved Fannie Seller/Servicer." On **December 18, 2013,** LenderLive sent the homeowner a letter stating, **"LenderLive Network is servicing your account on behalf of WG2 Mortgage Trust VII."** The Assignment of Mortgage from WG1 to WG2 was signed and notarized on **March 18, 2014**.

Once again another servicer, SN Servicing, sends a 5th Notice of Assignment, Sale or Transfer of Loan letter to the homeowner dated March 2, 2016 that there is yet another "owner (aka "lender") is the person to whom the loan belongs. **WR Asset Trust ("WRAT")** claimed the loan on **February 11, 2016.** WRAT is never brought forth into the foreclosure case or even addressed. The documentation before the court was again ignored.

 **SERVICING CORPORATION**
323 5TH STREET
EUREKA CA 95501

(800) 603-0836
Para Español, Ext. 2660 o 2643
5:00 a.m. – 5:00 p.m. Pacific Time
Main Office NMLS #5865
Branch Office NMLS #5785

March 2, 2016

## NOTICE OF ASSIGNMENT, SALE OR TRANSFER OF LOAN

Dear Borrower:

The Truth in Lending Act, 15 U.S.C. 1601, requires that borrowers receive a written Notice when their loan is assigned, sold or transferred. This assignment, sale or transfer does not change the terms of your loan or your contractual obligations as described in your loan documents. The information below describes the details of the assignment, sale or transfer of your mortgage loan:

- Date of Assignment, Sale or Transfer: **February 11, 2016**

- The transfer of ownership has been filed in the mortgage records for the county or local jurisdiction where the property securing this mortgage is located or registered with Mortgage Electronic Registration systems, Inc. whichever is applicable to this mortgage loan.

- A servicer is authorized to act on behalf of the owner/lender to handle the daily servicing of your loan. Your servicer collects payments for your account. **If you have any questions about your loan, please contact your servicer at the telephone number, address or website listed below:**

Name.            **SN Servicing Corporation**
Address:         323 Fifth Street, Eureka CA 95501
Telephone Number:  **(866) 683-9536 (Toll free) 8:00 a.m. - 5:00 p.m. Pacific Time**
Website Address:  www.snsc.com

- An owner (also known as a "lender") is the person to whom the loan belongs. The identity of your new owner is:

Name:            **WR Asset Trust**
Address:         **2915 E Baseline Rd, Ste 109; Gilbert, AZ 85234**
Telephone Number.  **(855) 255-3689**

### Partial Payment:

On behalf of the lender, the servicer may hold payments that are less than the full amount due (partial payments) in a separate account until you pay the rest of the payment, and then apply the full payment to your loan.

If this loan is sold, your new lender may have a different policy

**Please do not send payments to the owner listed above, as they will not be credited to your loan. Your monthly payments and all inquiries must be sent directly to your servicer, SN Servicing Corporation. The servicer has authority to act on the owner's behalf with regard to the administration of your loan.**

WRAT is actually WR Asset Trust aka Window Rock Residential Recovery Fund, L.P., Window Rock Capital Partner GP, LLC, Window Rock Manager, LLC, WINDOW ROCK INVESTMENT OPERATIONS, LLC, all located at 2915 E Baseline Rd, Ste 109, Gilbert, AZ 85234-2427.

During this entire period the homeowner was trying to obtain information and a decent modification of his loan. His loan (along with millions of others) was a hot potato, caught up in a whirlwind of deceit and toxic mortgage allegations. The servicers were not following through. The servicer and loan statements changed hands so many times it was hard to keep up with who owned the servicing rights let alone the loan, who to talk to, how much was owed, and where to send payments.

Plaintiff's Verified Complaint filed August 19, 2014 was preceded by actions taken against all of the banks, related to homeowner's loan history, for crimes and deception carried on before and during:
☉ The 2011 Office of the Comptroller of the Currency ("OCC") Consent Orders;
☉ The 2011 SEC Complaints & Settlements
☉ The 2011 FHFA, as conservator of Fannie and Freddie Complaints & Settlements;
☉ The 2011 FHFA Complaints & Settlements;
☉ Federal Reserve Consent Orders:
☉ U.S. Commodity Futures Trading Commission Orders;
☉ The 2012 DOJ v. Banks Complaints & Settlements;
☉ The 2012 National Mortgage Complaint & Settlement.

These investigation cases, orders and 'settlements with admissions' that followed made clear the wrong doings, fraud, and, falsified documents, such as the breeder assignment, were evidence of a scheme. Documents should have been extracted from public files as ordered and properly corrected – but they weren't. In Hawaii, none of the orders were adhered to, ordered, or even considered by the foreclosure courts.

It's now September 2020. The homeowner has been hammered. He and his son are about to be evicted, his attorney was just disbarred. He starts looking over his file and realizes that something is askew. On July 12, 2020, opposing counsel filed a declaration including a the foreclosure commissioner's report where the property was sold to the 4th Assignment of Mortgage assignee/Plaintiff without even a mention of WRAT – the 5th assignee. No documents were produced have relinquished the WRAT Assignment of Mortgage, even if it were valid. And there was nothing filed in his defense.

These are just 2 incidences above, of probably millions that have been so heavily manipulated over the last 12 years that FHA loan identifiers are just buried. We know the Treasury, Fannie (as financial agent for the United States, and the Federal Reserve hold the majority of these loans that were once in the fraudulent REMIC trusts. The Foreclosure & Eviction Moratorium should apply to all loans stemming from Mortgage Electronic Registration Systems, Inc. (a 1999 Fannie & Freddie created entity), as well as banks that participated in the securitization scheme through 2009.

We humbly ask that you, President Trump and Secretary Ben Carson, make the Foreclosure & Eviction Order inclusive enough to fight the manipulation of the securitization/rehypothecation mortgage documents abuse – no matter from where it stems – because American Homeowners understand how manipulated and corrupt the mortgage system was and continues to be. And we all need American Homeownership to remain healthy as it is a primary staple representing the greatness and freedom in our Republic.

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

Deupche Bank National Trust
Company
**Plaintiff/Petitioner**

CASE# 12 00 7647-11

VS.

Division 11

Rosa Lee Grier Et Al
**Defendant/Respondent**

A TRUE COPY

SEP 21 2021

### NOTICE OF FILING

( ) **Plaintiff/Petitioner**          ( )**Defendant/Respondent**

This is Homeowners Legal Rights

( )**Plaintiff/Petitioner**          ( )**Defendant/Respondent**

Signature: Rosalie L. Jenkins-Bay

Address: 5347 S. W. 25th St.

City, State, Zip: West Park FL. 33023 I

Phone: 954-549-5643



<div align="center">

**FILE DETAIL INFORMATION**
**STATE OF FLORIDA**

</div>

*Examination order by: Mr. Rosalie Jenkins*

| | |
|---|---|
| Application Date: | Around and before March 24 2006 (original application in file) |
| Purpose of Loan: | Refinance |
| Borrower Address: | 5347 SW 25th Street West Park FL 33023 |
| Audit Property Address: | 5347 SW 25th Street West Park FL 33023 |

Lender:            Mariners Capital Inc
Transaction Type:     Home      Resale      { x } Refinance
Builder Name:      N/A
Lender Loan#:      109770

Loan Amount:      $200,000.00            N/A
Lien Position:      First            Second
Mortgage Broker,
      Company:      Anchor Mortgage (according to HUD-1)
 Phone:      954.336.1122   (1003 - Application in file)
Loan Officer:      Tandy Caraway (1003 - Application in file)

Closing Date:      March 24 2007
Funding Date:      March 29 2007
Settlement Agent:      Turnkey Title Corporation (HUD 1 in file)
Place of Settlement:      3696 North Federal Highway Suite 300 FT Lauderdale FL 33308

**MERS: NO**

<div align="center">

*9000 Sheridan St Pembroke Pines, Florida 33024 - Phone: (954) 655-6682 - Fax: (954) 862-2209*
*www.fmi-audit.com*

</div>



**ORIGINAL LENDER:** Mariners Capital Inc
**CURRENT LENDER/SERVICER**: *AHMSI, American Home Mortgage Servicing Inc*

**Examiner Comments**: This loan has not been close under MERS documents; however retained servicing rights are not the norm. It is rare these days for lenders to retain servicing rights. Today, the loan servicing industry is highly concentrated, largely due to economies of scale. Rather than insist that lenders retain servicing rights-as a way to discipline lenders-investors or bond insurers usually press them to employ outside master servicers to ensure a high level of servicing. As a result, the originator's loan servicing rights are generally sold for a fee to one of small group of specialist firms in the field. Thus, high potential servicing costs are not disincentives to lenders making predatory loans.

The original Mortgages for the mortgage loans have been recorded in the name of Mortgage Electronic Registration Systems, Inc., or MERS, solely as nominee for the originator and its successors and assigns, and subsequent assignments of those mortgages have been, or in the future will be, registered electronically through the MERS® System. In some other cases, the original Mortgage was recorded in the name of the originator of the mortgage loan, record ownership was later assigned to MERS, solely as nominee for the owner of the mortgage loan, and subsequent assignments of the Mortgage were, or in the future may be, at the sole discretion of the servicer, registered electronically through the MERS® System. For each of these mortgage loans, MERS serves as mortgagee of record on the mortgage solely as a nominee **in an administrative capacity** on behalf of the trustee, and <u>does not have</u> any interest in the mortgage loan.

## <u>Loan Modification Remedies</u>

1) Loan Modification: Many Borrowers give the Violation List to loan Modifiers/company to get the Lender to modify the terms of the loan. If the Lender refuses the Borrower may choose to hire a lawyer and go to court. Once a loan is modified the Borrower may no longer sue.

2) 3 Year TILA Rescission: Some TILA violations can allow rescission for 3 years, with harsh penalties to the Lender. An APR that is grossly inaccurate, Finance Charges that are undisclosed, an inaccurate Notice of Right to Cancel, or failure to supply 2 copies of the Notice of Right to Cancel to each Borrower on Refinance are all grounds for Rescission.



3) 1 Year TILA Suit: Other TILA violations can be grounds for suit for 1 year after documents are signed.
4) State Rescission: Misrepresentation, Fraud, lack of Consideration can be reasons for Rescission in many States, based on State Laws.

5) Lawsuits: Any substantial violations can be ground to sue the Lender.
Borrowers should consult an attorney, to see which remedy is best.



## Forensic Report Violation Found

1) Mortgage Broker License test **FAIL** – State Violation Page (s) 10

2) Mortgage brokerage Agreement test  **ALERT** Page(s) 11

3)  Good Faith Estimates test **FAIL** RESPA Violation Page(s) 12

4)  Accuracy of GFE  **FAIL** RESPA Violation page(s) 13

5)  YIELD SPREAD  disclosure test **FAIL**  RESPA Violation Page(s) 13

6)  Broker Breach of Fiduciary Duty test  **FAIL** – RESPA Violation Page(s) 14

7)  Income Accuracy Disclose on 1003  **ALERT**  – Page(s) 15- 16

8)  LIS PENDENS – Page (s) 18

9)  Anatomy of the Pool and Lost Note – Page (s) 20 – 21

10)  Lender Voluntarily dismissal Letter on- Page (s) 24

Note: The MPSA is attached to this report in a separate email

Page 4



**OCC and OTS Mortgage Metrics Report**



# OCC and OTS Mortgage Metrics Report

## Second Quarter 2010

### *Overall Mortgage Performance*

The percentage of current and performing mortgages remained unchanged from the previous quarter at 87.3 percent. The percentage of mortgages 30 to 59 days delinquent increased to 3.1 percent at the end of the second quarter of 2010, compared with 2.8 percent at the end of the previous quarter and 3.2 percent a year ago. The percentage of seriously delinquent mortgages was 6.2 percent, a decrease of 5.3 percent from the previous quarter but up 16.1 percent from a year ago. Foreclosures in process were 3.4 percent of the total portfolio, a 1.4 percent decrease from the previous quarter but a 16.1 percent increase from a year ago.

*9000 Sheridan St Pembroke Pines, Florida 33024 - Phone: (954) 655-6682 - Fax: (954) 862-2209*
*www.fmi-audit.com*



| Table 9. Overall Portfolio Performance | | | | | | |
|---|---|---|---|---|---|---|
| (Percentage of All Mortgages in the Portfolio) | | | | | | |
| | 6/30/09 | 9/30/09 | 12/31/09 | 3/31/10 | 6/30/10 | 1Q %Change | 1Y %Change |
| Current and Performing | 88.6% | 87.2% | 86.4% | 87.3% | 87.3% | 0.1%* | -1.4% |
| 30–59 Days Delinquent | 3.2% | 3.4% | 3.4% | 2.8% | 3.1% | 11.0% | -3.5% |
| **The Following Three Categories Are Classified as Seriously Delinquent:** | | | | | | |
| 60–89 Days Delinquent | 1.4% | 1.6% | 1.6% | 1.3% | 1.3% | 2.5% | -8.8% |
| 90 or More Days Delinquent | 3.2% | 3.9% | 4.7% | 4.5% | 4.1% | -9.5% | 26.0% |
| Bankruptcy 30 or More Days Delinquent | 0.7% | 0.7% | 0.8% | 0.8% | 0.8% | 6.3% | 20.8% |
| *Subtotal for Seriously Delinquent* | **5.3%** | **6.2%** | **7.1%** | **6.5%** | **6.2%** | **-5.3%** | **16.1%** |
| Foreclosures in Process | 2.9% | 3.2% | 3.2% | 3.5% | 3.4% | -1.4% | 16.1% |
| Overall Portfolio Performance (Number of Mortgages in the Portfolio) | | | | | | |
| Current and Performing | 29,962,265 | 29,666,568 | 29,217,743 | 29,574,957 | 29,483,014 | -0.3% | -1.6% |
| 30–59 Days Delinquent | 1,078,663 | 1,154,825 | 1,138,822 | 939,306 | 1,038,422 | 10.6% | -3.7% |
| **The Following Three Categories Are Classified as Seriously Delinquent:** | | | | | | |
| 60–89 Days Delinquent | 476,179 | 529,845 | 525,071 | 424,534 | 433,201 | 2.0% | -9.0% |
| 90 or More Days Delinquent | 1,093,791 | 1,332,228 | 1,604,014 | 1,525,563 | 1,374,816 | -9.9% | 25.7% |
| Bankruptcy 30 or More Days Delinquent | 228,562 | 249,515 | 259,853 | 260,296 | 275,568 | 5.9% | 20.6% |
| *Subtotal for Seriously Delinquent* | **1,798,532** | **2,111,588** | **2,388,938** | **2,210,393** | **2,083,585** | **-5.7%** | **15.8%** |
| Foreclosures in Process | 992,554 | 1,091,620 | 1,079,386 | 1,170,785 | 1,149,770 | -1.8% | 15.8% |

*Unrounded numbers yield a 0.1% difference from the previous quarter.

**Figure 2. Overall Portfolio Performance**



*9000 Sheridan St Pembroke Pines, Florida 33024 - Phone: (954) 655-6682 - Fax: (954) 862-2209*
*www.fmi-audit.com*



## Mortgages 30–59 Days Delinquent, by Risk Category

Early stage delinquencies—mortgages 30 to 59 days delinquent—increased across all risk categories during the second quarter. Overall, 3.1 percent of the total portfolio was 30 to 59 days delinquent at the end of the quarter, 11.0 percent higher than the prior quarter but 3.5 percent less than a year ago. Historically, early stage delinquencies tend to increase in the second quarter of each year.

### Table 13  Mortgages 30–59 Days Delinquent
(Percentage of Mortgages in Each Category)

| | 6/30/09 | 9/30/09 | 12/31/09 | 3/31/10 | 6/30/10 | 1Q %Change | 1Y %Change |
|---|---|---|---|---|---|---|---|
| Prime | 1.7% | 1.8% | 1.9% | 1.6% | 1.7% | 6.5% | -2.6% |
| Alt-A | 6.4% | 6.5% | 6.5% | 5.3% | 6.1% | 13.2% | -5.0% |
| Subprime | 10.2% | 10.2% | 10.0% | 8.3% | 9.6% | 15.6% | -6.3% |
| Other | 3.8% | 4.7% | 4.5% | 3.6% | 4.2% | 16.0% | 11.5% |
| Overall | 3.2% | 3.4% | 3.4% | 2.8% | 3.1% | 11.0% | -3.5% |

(Number of Mortgages)

| | 6/30/09 | 9/30/09 | 12/31/09 | 3/31/10 | 6/30/10 | 1Q %Change | 1Y %Change |
|---|---|---|---|---|---|---|---|
| Prime | 392,412 | 420,000 | 432,188 | 360,385 | 385,900 | 7.1% | -1.7% |
| Alt-A | 224,971 | 230,077 | 232,609 | 190,767 | 218,912 | 14.8% | -2.7% |
| Subprime | 291,285 | 284,251 | 275,235 | 221,157 | 250,921 | 13.5% | -13.9% |
| Other | 169,995 | 220,497 | 198,790 | 166,997 | 182,689 | 9.4% | 7.5% |
| Total | 1,078,663 | 1,154,825 | 1,138,822 | 939,306 | 1,038,422 | 10.6% | -3.7% |

*9000 Sheridan St Pembroke Pines, Florida 33024 - Phone: (954) 655-6682 - Fax: (954) 862-2209*
*www.fmi-audit.com*



### CLOSING DOCUMENT LIST NEEDED FOR FORENSIC AUDIT

**CODED:   P= Provided for examination Purpose – NP= Not Provided for examination**
 **List of Documents received from Borrower/Lawyer:**
1) Uniform Residential Loan Application (FNMA 1003)
   Initial Application provided by Broker at Application      N/P
   Final Application Provided By Lender Prior to Closing     P
2) Transmittal Summary (1008)          N/P
3) HUD-1 / HUD-1A Closing Settlement Statement     P
4) NOTE and All Riders          P
5) PPP = Prepayment Penalty        N/A
6) Mortgage          P
7 Mortgage Assignment (If Applicable)      P
8) _Disclosure:_
  Good Faith Estimate (GFE)       P
  Truth in Lending Act (TILA)      P
  State Required Application Disclosure   P
  Brokerage Service Contract     N/P
  RESPA Servicing Disclosure     P

### OTHER DISCLOSURE; PROVIDED BY LENDER AT CLOSING
1) Good Faith Estimate (GFE)      N/P
2) Truth in Lending (TIL)      P
3) RESPA Servicing Disclosure     P
4) Affiliated Business Disclosure    P
5) PUD/Condo        N/A
6) Occupancy Agreement      P
7) Escrow/Tax Disclosure     N/A
8) ARM Disclosure       P
9) Section32 (HOEPA) Disclosure    N/A
10) Right of Rescission (Refinance)    N/A
11) Servicing Transfer Notification    P
12) Collection Notice/First Payment    P
13) Escrow Analysis (End of Year)    N/A
14) Appraisal Disclosure      P
15) Borrowers Authorization     P
16) FCRA Disclosure (Credit Score)    P
17) Insurance Requirements for Closing   N/A
18) Letters received notifying of Servicing Changes (POST CLOSING) Unknown

9000 Sheridan St Pembroke Pines, Florida 33024 - Phone: (954) 655-6682 - Fax: (954) 862-2209
www.fmi-audit.com



## LOAN DETAILS

1.  *This loan was originally applied as Primary Resident*      *YES*

2.  *If not, was it for investment?   N/A*

3.  *It is a 2nd Home? : NO*

4.  *Is the property currently use as originally intended?*      **YES**

5.  *Property Homestead?*      *YES*

6.  *Mortgage Payment Record:*      *Late since March 1 2009*

7.  *Reasons for default(Hardship)*      *Unknown*

8.  *Servicing Changes since closing?*      *NA*

9.  *Mortgage is Serviced by: American Home Mortgage Servicing Inc*

10. *Address of Servicer :*      *Irving TX*

11. *Phone Number:*      *877-304-3100*

12. *Lender Provided Borrower with alternative?*      *YES*

13. *Servicers provide any Loan Modification Alternative?*      *YES*

14. *Borrower file response on :*      *Or about August 2010*

15. *Lender/Servicer offer for modification received*      *YES*

16. *Term and condition acceptable to Borrower?*      *NO*

Page 9



## *EXAMINER MORTGAGE BROKER LICENSE REVIEW*
### FAIL

Based on documents received from Borrower, Rosalie Jenkins, we found that she is a unmarried woman, signed a promissory Note for a Mortgage Loan for purchase transaction located at 5347 SW 25th Street West Park FL 33023

The promissory Note was originated by Mariners Capital, located at 500 Superior Ave # 120 Newport Beach California 92663. The Broker was Anchor Mortgage; there is no evidence in public records of the broker License at the time of closing in 03/24/2006. According to the 1003, the Mortgage Broker legal address to originate Mortgage Loans was at: 2200 Glades Boca Raton FL 33431. There is no license under that address (see evidence below)



Online Services

**PUBLIC LICENSE SEARCH**

| 3 Records Found | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Name | Name Type | License Type | License Number | Address | City | County | State | Status |
| AAANCHOR MORTGAGE LENDERS INC | Primary | Mortgage Brokerage Business | MBB0302911 | 22449 MARTELLA AVE | BOCA RATON | PALM BEACH | FL | Expired |
| ANCHOR MORTGAGE | DBA | Mortgage Brokerage Business | MBB0302763 | ONE WEST CAMINO REAL | BOCA RATON | PALM BEACH | FL | Terminated |
| ANCHOR MORTGAGE | DBA | Correspondent Mortgage Lender | CL0501366 | ONE WEST CAMINO REAL | BOCA RATON | PALM BEACH | FL | Terminated |



<div style="border">

*STATE SPECIFIC DISCLOSURES: FLORIDA*

</div>

*Mortgage Brokerage Agreement: **PASS** > Bait & Switch: **ALERT***

<u>**Examiner Comments:**</u> There is evidence in file of the Mortgage brokerage Business contract in file evidencing borrower's knowledge of fee's schedule. The only way that a mortgage broker can collect a fee under Florida law is if there is a broker agreement. The agreement is required to contain a description of the services that the brokerage business will provide, and the terms of the fee that the business will charge. The written agreement must be **executed within three business days after the mortgage application is accepted** and must describe the services to be provided by the mortgage brokerage business and specify the amount and terms of the mortgage brokerage fee that the mortgage brokerage business is to receive.

The written mortgage brokerage agreement must be executed within 3 business days after a mortgage loan application is accepted if the borrower is present when the application is accepted. If the borrower is not present when such an application is accepted, the licensee shall forward the written mortgage brokerage agreement to the borrower within 3 business days after the licensee's acceptance of the application and the licensee bears the burden of proving that the borrower received and approved the written mortgage brokerage agreement. Fla. Stat. 494.0038(1) (a) (2).See Related law next page.

**ALERT – There is no evidence about Anchor Mortgage License as Mortgage Broker Business in public records. Therefore, this Mortgage Brokerage Agreement is not valid.**

**FAIL-** There no evidence in file of the Mortgage Broker Business Contract has been provided to the borrowers the same day of closing (see next page) not at the time of application. Therefore the final fees collected at closing by Originator Broker may consider unearned fee and or, overcharge fees.

**FAIL-** the Truth-In-Lending Disclosure shall also reflect accuracy with variance tolerance as applicable by law. Failure to reflect these requirements may be considered as "Bait and Switch" leading to further Deceptive Trade Practice clearly prohibited by law pursuant to the Truth in Lending Act (TILA); 12 US.0 §2604 as well as 24 C.F.R. §3500.7, Regulation Z 12 C.F.R. §226.19. Without the Broker Business Contract the initial offered interest will be unknown.

Page 11



**RELATED LAW**: *Florida § 494.0038Mortgage Broker Disclosure*

*(1)(a)1. A person may not receive a mortgage brokerage fee except pursuant to a written mortgage brokerage agreement between the mortgage brokerage business and the borrower which is signed and dated by the business and borrower.*

*2. The written mortgage brokerage agreement must describe the services to be provided by the mortgage brokerage business and specify the amount and terms of the mortgage brokerage fee that the mortgage brokerage business is to receive. The written mortgage brokerage agreement must be executed within 3 business days after a mortgage loan application is accepted if the borrower is present when the application is accepted. If the borrower is not present when such an application is accepted, the licensee shall forward the written mortgage brokerage agreement to the borrower within 3 business days after the licensee's acceptance of the application and the licensee bears the burden of proving that the borrower received and approved the written mortgage brokerage agreement.*

*(b)1. If the mortgage brokerage business is to receive any payment of any kind from the lender, the maximum total dollar amount of the payment must be disclosed to the borrower in the written mortgage brokerage agreement as described in paragraph (a). The commission may prescribe by rule an acceptable form for disclosure of brokerage fees received from the lender. The mortgage brokerage agreement must state the nature of the relationship with the lender, describe how compensation is paid by the lender, and describe how the mortgage interest rate affects the compensation paid to the mortgage brokerage business.*

*2. The exact amount of any payment of any kind by the lender to the mortgage brokerage business must be disclosed in writing to the borrower within 3 business days after the mortgage brokerage business is made aware of the exact amount of the payment from the lender but not less than 3 business days before the execution of the closing or settlement statement. The licensee bears the burden of proving such notification was provided to the borrower.*

**GOOD FAITH ESTIMATES: FAIL**

**Examiner comments:** there is no evidence in file of GFE disclosure.
Pursuant to RESPA Rules 24 C.F.R §3500.7 (b) the lender in a transaction is to provided to the borrower a GFE Disclosure within three (3) business days of application.



### 494.0038 Mortgage broker disclosures.--

2- At the time a written mortgage brokerage agreement is executed by the borrower or forwarded to the borrower for execution, or at the time the mortgage brokerage business accepts an application fee, credit report fee, property appraisal fee, or any other third-party fee, but not less than 3 business days before execution of the closing or settlement statement, the mortgage brokerage business shall disclose in writing to any applicant for a mortgage loan the following information:

(c) **A good faith estimate, signed and dated by the borrower**, which discloses the total amount of each of the fees which the borrower may reasonably expect to pay if the loan is closed, including, but not limited to, fees earned by the mortgage brokerage business, lender fees, third-party fees, and official fees, together with the terms and conditions for obtaining a refund of such fees, if any. Any amount collected in excess of the actual cost shall be returned within 60 days after rejection, withdrawal, or closing. The good faith estimate must identify the recipient of all payments charged the borrower and, except for all fees to be received by the mortgage brokerage business, may be disclosed in generic terms, such as, but not limited to, paid to lender, appraiser, officials, Title Company, or any other third-party service provider. This requirement does not supplant or is not a substitute for the written mortgage brokerage agreement described in subsection (1).

<u>**Accuracy of *GFE*: FAIL (same reason as above)**</u>

**Examiner comments:** the loan originator **Anchor Mortgage charged** Origination, Broker, Processing, and Administration fee's at closing. There is no evidence in file of the GFE.  This is a violation of RESPA

| 800. | Items Payable In Connection With Loan | | |
|---|---|---|---|
| 801. | Loan Origination Fee $2,000.00 to: Broker | → | 2,000.00 |
| 802. | Loan Discount | | |
| 808. | PROCESSING FEE to: ANCHOR MORTGAGE | → | 300.00 |
| 809. | UNDERWRITING FEE to: Lender | | 995.00 |
| 810. | BROKER FEE to: ANCHOR MORTGAGE | → | 550.00 |
| 811. | ADMINISTRATION FEE to: ANCHOR MORTGAGE | → | 250.00 |
| 812. | | | |

This may consider a kick back or unearned fee because there is no evidence in file that the Broker disclosed these fees.
The lender is directly responsible for due diligence on fees charged to the borrower by Broker's. The disclosures sequence stated above does not follow the legal, mandatory and recommended procedure by HUD, RESPA and Florida Law. Please consult your legal

Page 13



Attorney about a strategy to follow

**Broker Breach of Fiduciary Duty: FAIL**
Most courts have held that a mortgage broker is a fiduciary. One who undertakes to find and arrange financing or similar products for another becomes the latter's agent for that purpose, and owes statutory, contractual, and fiduciary duties to act in the interest of the principal and make full disclosure of all material facts. "A person who undertakes to manage some affair for another, on the authority and for the account of the latter, is an agent."

Courts have described a mortgage loan broker as an agent hired by the borrower to obtain a loan. As such, a mortgage broker owes a fiduciary duty of the "highest good faith toward his principal," the prospective borrower. Most fundamentally, a mortgage broker, like any other agent who undertakes to procure a service, has a duty to contact a variety of providers and attempt to obtain the best possible terms.
Additionally, a mortgage broker "is 'charged with the duty of fullest disclosure of all material facts concerning the transaction that might affect the principal's decision'." The duty to disclose extends to the agent's compensation.

Furthermore, the duty to disclose is not satisfied by the insertion of cryptic "disclosures" on documents. The obligation is to "make a full, fair and understandable explanation" of why the fiduciary is not acting in the interests of the beneficiary and of the reasons that the beneficiary might not want to agree to the fiduciary's actions.
The industry has itself recognized these principles. The National Association of Mortgage Brokers has adopted a Code of Ethics which requires, among other things, that the broker's duty to the client be paramount.

Paragraph 3 of the Code of Ethics states:
In accepting employment as an agent, the mortgage broker pledges himself to protect and promote the interest of the client. The obligation of absolute fidelity to the client's interest is primary.



INCOME ACCURACY DISCLOSE ON 1003: **ALERT**

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 3,500.00 | $ | $ 3,500.00 | Rent | $ 0.00 | |
| Overtime | | | | First Mortgage (P&I) | 1,300.00 | $ 1,466.14 |
| Bonuses | | | | Other Financing (P&I) | 0.00 | |
| Commissions | | | | Hazard Insurance | 141.67 | 141.67 |
| Dividends/Interest | | | | Real Estate Taxes | 125.22 | 125.22 |
| Net Rental Income | | | | Mortgage Insurance | 0.00 | |
| Other (before completing, see the notice in "describe other income," below) | 3,500.00 | | 3,500.00 | Homeown. Assn. Dues | 0.00 | |
| | | | | Other: | 0.00 | |
| Total | $ 7,000.00 | $ | $ 7,000.00 | Total | $ 1,566.89 | $ 1,733.03 |

**Examiner comments:** the copy provided by the lender is not clear, therefore we enlarge 200 times to read the Income disclosed. The income disclosed was $ 7,000.00. The borrower stated that he didn't disclose that amount. We do not have tax return 2004-2005-2006 to scrutinize the accuracy of the borrower income. ALERT- the lender Mariner's Capital required the 4506 T form to be signed, as part of income verification disclosed on 1003.
In other words, the borrower authorized the Lender underwriting department to request 2004-2005-2006 TAX Return.
This may consider overstated income disclosed on 1003, with the purpose of obtaining the final lender approval.
The mortgagee shall exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment. Mortgagee procedures that evidence such due diligence shall be incorporated as part of the quality control.
The mortgagee shall evaluate the mortgagor's credit characteristics, adequacy and **stability of income** to meet the periodic payments under the mortgage and all other obligations, and the adequacy of the mortgagor's available assets to close the transaction, and render an underwriting decision in accordance with applicable regulations, policies and procedures.

*9000 Sheridan St Pembroke Pines, Florida 33024 - Phone: (954) 655-6682 - Fax: (954) 862-2209*
*www.fmi-audit.com*



## *DEFECTIVE MORTGAGE OR NOTE: PASS - Alert*

The mortgage or note may be defective if the note and the riders do not match in the terms set. Alert –The mortgage, note and riders must be carefully scrutinized to determine defects. The recovery under defective document may vary greatly depending on the terms that are invalid. If several material terms are materially defective, then the court may rule the loan as null and void. Under special circumstances, when immaterial facts are deemed incorrect, the court may rule to correct and modify the terms of the loan.

A lot of the mortgage foreclosure cases we saw involved affidavits of lost notes .An affidavit of lost note is essentially a sworn statement that says, "we own this debt, but we can't find any paperwork to prove it, so please just take our word for it".  A bit of investigation revealed that in many cases, the paperwork didn't exist, or originated at the wrong time, or conflicting interests had been recorded.  In some cases, notes had been illegally purchased by pools after they were already in default.

## *LENDER SECURITIZED LOAN: ALERT*

**Examiner Comments***:* The mortgage or note may be defective if the note and the riders do not match in the terms set. The mortgage, note and riders must be carefully scrutinized to determine defects. The recovery under defective document may vary greatly depending on the terms that are invalid. If several material terms are materially defective, then the court may rule the loan as null and void. Under special circumstances, when immaterial facts are deemed incorrect, the court may rule to correct and modify the terms of the loan.

A lot of the mortgage foreclosure cases we saw involved affidavits of lost notes .An affidavit of lost note is essentially a sworn statement that says, "we own this debt, but we can't find any paperwork to prove it, so please just take our word for it".  A bit of investigation revealed that in many cases, the paperwork didn't exist, or originated at the wrong time, or conflicting interests had been recorded.  In some cases, notes had been illegally purchased by pools after they were already in default.

With respect to the lender's producing the promissory note in order to proceed with a foreclosure action, the examiner points out that of even more importance than producing the note, the lender seeking to enforce a missing instrument:

- must be entitled to enforce the instrument,
- must prove the instrument's terms, and
- must prove its right to enforce the instrument

Pursuant to *§3-309 (a) (1) & (b)* of the UCC.



## LOST or DESTROYED of PROMISSORY NOTE

Summary - Examiner to Lawyer or Legal Advisor:

The person seeking to enforce the note must show that:

(1)  It is the holder of this note <u>original</u> by transfer, with all necessary rounds;
(2)  It had possession of the note before it was lost;
(3)  If it can show that title to the note runs to it, but the original is lost or destroyed, the holder must be prepared to post a bond;
(4)  If the person seeking to enforce is an agent, it must show its agency status <u>and</u> that it's principal is the holder of the note (and meets the above requirements).

## For Foreclosure Situation:

***Real Party in Interest:*** Ever); foreclosure action may be brought in the name of the party who has the legal right to bring action against the "defendant" in this case a foreclosure. This is the legal foundation of a lawsuit, or to have "legal standing". Chain of title must be determined to clarify the chain of ownership of the note, which is the legal instrument in question, giving the right to the legal action of recovery and relief. If this is a securitized loan, the attorney must initiate discovery proceedings to determine "Real Party in Interest". You must speak to your attorney about this issue. Successfully challenging standing may cause the foreclosure action to be dismissed in court. You have the right to inspect the original note (signed in blue/actual ink). In federal court refer to Civil Rule 34(a) (1) (A); Florida refer to Civil Rule 1.210(a)/Ohio Civil Rule 17.



**LIS PENDENS – COMPLAINT**

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT OF FLORIDA
IN AND FOR BROWARD COUNTY
GENERAL JURISDICTION DIVISION
CASE NO.

DEUTSCHE BANK NATIONAL TRUST
COMPANY, AS TRUSTEE FOR THE
CERTIFICATEHOLDERS OF SOUNDVIEW
HOME LOAN TRUST 2006-OPT5, ASSET-
BACKED CERTIFICATES, SERIES 2006-
OPT5,

09 03 3770

    Plaintiff,

vs.

**COMPLAINT**

ROSALIE JENKINS A/K/A ROSALIE L.
JENKINS A/K/A ROSA LEE GRIER;
UNKNOWN SPOUSE OF ROSALIE
JENKINS A/K/A ROSALIE L. JENKINS
A/K/A ROSA LEE GRIER; UNKNOWN
TENANT #1; UNKNOWN TENANT #2,
    Defendants,



A TRUE COPY
JUN 17 2009
HOWARD C. FORMAN
CLERK OF CIRCUIT COURT
BROWARD COUNTY, FL

*13*

**MASTER POOLING & SERVICING AGREEMENT**

**Examiner comments:** according to the (Prospectus filed pursuant to Rule 424(b)(5)) on 06.20.06 at US Exchange & Commission, the parties involve are the following:

**The Issuing Entity**
**Soundview Home Loan Trust 2006-OPT5**, a New York common law trust established under the pooling and servicing agreement. The Issuing Entity is also referred to as the trust in this prospectus supplement. *We refer you to "The Issuing Entity" in this prospectus supplement for additional information .*

**The Depositor**
**Financial Asset Securities Corp.**, a Delaware corporation and an affiliate of Greenwich Capital Markets, Inc. *We refer you to "The Depositor" in this prospectus supplement for additional information.*

*9000 Sheridan St Pembroke Pines, Florida 33024 - Phone: (954) 655-6682 - Fax: (954) 862-2209*
*www.fmi-audit.com*

Page 18



**Originator, Sponsor and Servicer**
**Option One Mortgage Corporation,** a California corporation. Any obligation specified to be performed by the servicer in the prospectus is an
obligation to be performed by the Servicer with respect to the Mortgage Loans. *We refer you to "The Originator and the Sponsor" and the*
*"The Servcier" in this prospectus supplement for additional information.*

**Seller**
Any or all of: (i) Option One Mortgage Corporation, a California corporation or (ii) Option One Owner Trust 2001-1A, Option One Owner Trust 2001-1B, Option One Owner Trust 2001-2, Option One Owner Trust 2002-3, Option One Owner Trust 2003-4, Option One Owner Trust 2003-5, Option One Owner Trust 2005-6, Option One Owner Trust 2005-7, Option One Owner Trust 2005-8 and/or Option One Owner Trust 2005-9, each a Delaware statutory trust that previously acquired mortgage loans from the Originator. *We refer you to "The Seller" in this prospectus supplement for additional information.*

**Trustee**
**Deutsche Bank National Trust Company,** a national banking association. *We refer you to "The Trustee" in this prospectus supplement for additional information.*

**Custodian**
**Wells Fargo Bank, N.A.**, a national banking association. *We refer you to "The Pooling Agreement—The Custodian" in this prospectus supplement for additional information.*
**Credit Risk Manager**

**Clayton Fixed Income Services Inc.**, formerly known as The Murrayhill Company, a Colorado corporation. *We refer you to "The Pooling Agreement—The Credit Risk Manager" in this prospectus supplement for additional information.*

**NIMS Insurer**
One or more insurance companies (together, the "NIMS Insurer") may issue a financial guaranty insurance policy covering certain payments to
be made on net interest margin securities to be issued by a separate trust and secured by all or a portion of the Class C Certificates and the
Class P Certificates. In such event, the NIMS Insurer will be able to exercise rights which could adversely impact the certificateholders.
*We refer you to "Risk Factors—Rights of NIMS Insurer" in this prospectus supplement for additional information.*

*9000 Sheridan St Pembroke Pines, Florida 33024 - Phone: (954) 655-6682 - Fax: (954) 862-2209*
*www.fmi-audit.com*



## Anatomy of the Pool

**SECURITIZATION SCHEME BASIC STRUCTURE**

In its simplest form a Securitization involves (1) the sale of a large pool of Receivables by an entity (**Originator**) that creates such Receivables (or purchases the Receivables from entities that create them) in the course of its business to a "bankruptcy remote," special purpose entity (**SPE**) in a manner that qualifies as a "true sale" (vs. a secured loan) and is intended to achieve certain results for accounting purposes, as well as protecting the Receivables from the claims of creditors of the Originator, and (2) the issuance and sale by the SPE (**Issuer**), in either a private placement or public offering, of debt securities (**Securities**) that are subsequently satisfied from the proceeds of and secured by the Receivables. When the Securitization is "closed," funds flow from the purchasers of the Securities (**Investors** - usually banks, insurance companies and pension funds) to the Issuer and from the Issuer to the Originator. All of these transactions occur virtually simultaneously.

**The promissory Note must follow the chain of real true sale of transfer under this MPSA:**

**1ST Endorsement: Mariners Capital Inc** > Original Lender on Promissory Note

**2nd Endorsement:** From Mariners to > **Option One Mortgage Corporation – The Sponsor**

**3rd Endorsement:** From Option One Mortgage Corporation to > **Financial Asset Securities Corp – The Depositor**

Final Holder of the Note and Mortgage to > **Deutsche Bank National Trust Company**

**Examiner continuation Comments**: only then the Plaintiff can accomplish the following statement

### COUNT I

### FORECLOSURE OF MORTGAGE

1.      This is an action to foreclose a mortgage on real property in Broward County, Florida.

3.      Plaintiff owns and/or holds said note and mortgage



## COUNT II
### REESTABLISHMENT OF PROMISSORY NOTE

13.     This is an action to reestablish a Promissory Note pursuant to Section 71.011 and 673.3091, Florida Statutes.

14.     On March 24, 2006 at Broward County, Florida, a Promissory Note and Mortgage were executed and delivered by ROSALIE JENKINS A/K/A ROSALIE L. JENKINS A/K/A ROSA LEE GRIER, in favor of MARINERS CAPITAL, INC. in the principal amount of $200,000.00.

15.     The subject Promissory Note has been lost or destroyed and is not in the custody or control of the Plaintiff who is the owner and holder of the subject Note and Mortgage and its whereabouts cannot be determined.  Plaintiff neither has any knowledge as to when the subject

Our file 71963 | 0021334370 | jgr | N:\docs\fci\Comp-2ct.doc | Page 2 of 8

**Examiner comments:** ███████████████████████████████████████
███████. The **Custodian in this MPSA is** Wells Fargo Bank, N.A., a national
banking association. .We recommend to your lawyer requesting to the Plaintiff copy of the Form
X-17 F–1A which is a requirement on Lost Note as law mandate.

### General Rules and Regulations
### promulgated
### under the
### Securities Exchange Act of 1934

### Rule 17f-1 -- Requirements for Reporting and Inquiry with Respect to Missing, Lost, Counterfeit or Stolen Securities

*Definitions.* For purposes of this section:

The term **reporting institution** shall include every national securities exchange, member thereof, registered securities association, broker, dealer, municipal securities dealer, government securities broker, government securities dealer, registered transfer agent, registered clearing agency, participant therein, member of the Federal Reserve System and bank whose deposits are insured by the Federal Deposit Insurance Corporation;

The term **uncertificated security** shall mean a security not represented by an instrument and the transfer of which is registered upon books maintained for that purpose by or on behalf of the issuer;

*9000 Sheridan St Pembroke Pines, Florida 33024 - Phone: (954) 655-6682 - Fax: (954) 862-2209*
*www.fmi-audit.com*



The term **global certificate securities issue** shall mean a securities issue for which a single master certificate representing the entire issue is registered in the nominee name of a registered clearing agency and for which beneficial owners cannot receive negotiable securities certificates;

The term **customer** shall mean any person with whom the reporting institution has entered into at least one prior securities-related transaction; and

The term **Securities-related transaction** shall mean a purpose, sale or pledge of investment securities, or a custodial arrangement for investment securities.

The term **securities certificate** means any physical instrument that represents or purports to represent ownership in a security that was printed by or on behalf of the issuer thereof and shall include any such instrument that is or was:

Printed but not issued;

Issued and outstanding, including treasury securities;

Cancelled, which for this purpose means either or both of the procedures set forth in <u>Rule 17Ad-19(a)(1)</u>; or

Counterfeit or reasonably believed to be counterfeit.

The term **issuer** shall include an issuer's:

Transfer agent(s), paying agent(s), tender agent(s), and person(s) providing similar services; and Corporate predecessor(s) and successor(s).

The term **missing** shall include any securities certificate that:

Cannot be located or accounted for, but is not believed to be lost or stolen; or

A transfer agent claims or believes was destroyed in any manner other than by the transfer agent's own certificate destruction procedures as provided in <u>Rule 17Ad-19</u>.

Every reporting institution shall register with the Commission or its designee in accordance with instructions issued by the Commission except:

A member of a national securities exchange who effects securities transactions through the trading facilities of the exchange and has not received or held customer securities within the last six months;

A reporting institution that, within the last six months, limited its securities activities exclusively to uncertificated securities, global securities issues or any securities issue for which neither record nor beneficial owners can obtain a negotiable securities certificate; or

A reporting institution whose business activities, within the last six months, did not involve the handling of securities certificates.

## <u>Reporting Requirements---</u>

**Missing or Lost Securities.** Every reporting institution shall report to the Commission or its designee, and to a registered transfer agent for the issue, the discovery of the loss of any securities certificate where criminal actions are not suspected when the securities certificate has

*9000 Sheridan St Pembroke Pines, Florida 33024 - Phone: (954) 655-6682 - Fax: (954) 862-2209*
*www.fmi-audit.com*



been missing or lost for a period of two business days. Such report shall be made within one business day of the end of such period except that:

**Securities certificates lost, missing** or stolen while in transit to customers, transfer agents, banks, brokers or dealers shall be reported by the delivering institution by the later of two business days after notice of non-receipt or as soon after such notice as the certificate numbers of the securities can be ascertained.

Where a shipment of retired securities certificates is in transit between any transfer agents, banks, brokers, dealers, or other reporting institutions, with no affiliation existing between such entities, and the delivering institution fails to receive notice of receipt or non-receipt of the certificates, the delivering institution shall act to determine the facts. In the event of non-delivery where the certificates are not recovered by the delivering institution, the delivering institution shall report the certificates as lost, stolen, or missing to the Commission or its designee within a reasonable time under the circumstances but in any event within twenty business days from the date of shipment.

Securities certificates considered lost or missing as a result of securities counts or verifications required by rule, regulation or otherwise (**e.g.,** dividend record date verification made as a result of firm policy or internal audit function report) shall be reported by the later of ten business days after completion of such securities count or verification or as soon after such count or verification as the certificate numbers of the securities can be ascertained.

*9000 Sheridan St Pembroke Pines, Florida 33024 - Phone: (954) 655-6682 - Fax: (954) 862-2209*
*www.fmi-audit.com*



IN THE CIRCUIT COURT OF THE SEVENTEENTH
JUDICIAL CIRCUIT OF FLORIDA IN AND FOR
BROWARD COUNTY
GENERAL JURISDICTION DIVISION
CASE NO. 09-33770 CACE 13

DEUTSCHE BANK NATIONAL TRUST
COMPANY, AS TRUSTEE FOR THE
CERTIFICATEHOLDERS OF SOUNDVIEW
HOME LOAN TRUST 2006-OPT5, ASSET-
BACKED CERTIFICATES, SERIES 2006-
OPT5,
     Plaintiff,

vs.

**NOTICE OF VOLUNTARY DISMISSAL**

ROSALIE JENKINS A/K/A ROSALIE L.
JENKINS A/K/A ROSA LEE GRIER;
UNKNOWN SPOUSE OF ROSALIE
JENKINS A/K/A ROSALIE L. JENKINS
A/K/A ROSA LEE GRIER; UNKNOWN
TENANT #1; UNKNOWN TENANT #2,
    Defendants.

*9000 Sheridan St Pembroke Pines, Florida 33024 - Phone: (954) 655-6682 - Fax: (954) 862-2209*
*www.fmi-audit.com*

This Instrument Prepared By:


LEGAL / SECURITY INSTRUMENT

After Recording Return To:
MARINERS CAPITAL, INC.
500 SUPERIOR AVE. #120
NEWPORT BEACH, CALIFORNIA 92663
Loan Number: 511045688

**CERTIFIED TO BE A TRUE AND
CORRECT COPY OF THE ORIGINAL**

———————————————————————— [Space Above This Line For Recording Data]————————

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)  "Security Instrument" means this document, which is dated MARCH 24, 2006          , together with all Riders to this document.
(B)  "Borrower" is  ROSA LEE GRIER A/K/A ROSALIE JENKINS, A SINGLE PERSON

Borrower is the mortgagor under this Security Instrument.
(C)  "Lender" is MARINERS CAPITAL, INC.

Lender is a CALIFORNIA CORPORATION                                            organized
and existing under the laws of CALIFORNIA                                            .
Lender's address is 500 SUPERIOR AVE. #120, NEWPORT BEACH, CALIFORNIA 92663                                            .

Lender is the mortgagee under this Security Instrument.
(D)  "Note" means the promissory note signed by Borrower and dated  MARCH 24, 2006          .
The Note states that Borrower owes Lender TWO HUNDRED THOUSAND AND 00/100
                                            Dollars (U.S. $ 200,000.00          )
plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than APRIL 1, 2036          .
(E)  "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(F)  "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01                                          Page 1 of 15

DocMagic €Fermus 800-649-1362
www.docmagic.com

(G)   "Riders" means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are to be executed by Borrower [check box as applicable]:

☐  Adjustable Rate Rider          ☐  Condominium Rider                    ☐  Second Home Rider
☐  Balloon Rider                      ☐  Planned Unit Development Rider    ☐  Other(s) [specify]
☐  1-4 Family Rider                  ☐  Biweekly Payment Rider

(H)   "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(I)   "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(J)   "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(K)   "Escrow Items" means those items that are described in Section 3.

(L)   "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for:  (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(M)   "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(N)   "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O)   "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P)   "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender:  (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.  For this purpose, Borrower does hereby mortgage, grant and convey to Lender, the following described property located in the

COUNTY                         of          BROWARD                              :
[Type of Recording Jurisdiction]              [Name of Recording Jurisdiction]

DocMagic *EFerms* 800-649-1362
www.docmagic.com

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N.: 51-42-19-02-1170

which currently has the address of 5347 SW 25 STREET

[Street]

HOLLYWOOD                   , Florida      33023              ("Property Address"):
        [City]                               [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:
1.  Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01                              Page 3 of 15

DocMagic *EForms* 800-649-1362
www.docmagic.com

until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.  **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.  **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA.

---

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01                               Page 4 of 15

*DocMagic* *eForms* 800-649-1362
www.docmagic.com

Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of

DocMagic eForms 800-649-1362
www.docmagic.com

any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee.  Lender shall have the right to hold the policies and renewal certificates.  If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices.  If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender.  Lender may make proof of loss if not made promptly by Borrower.  Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened.  During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds.  Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower.  If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.  Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters.  If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim.  The 30-day period will begin when the notice is given.  In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property.  Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  Occupancy.  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which

*DocMagic* *eFarms* 800-649-1362
www.docmagic.com

consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument; including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such

DocMagic *EForms* 800-649-1362
www.docmagic.com

insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement



or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security

DocMagic *EFamus* 800-649-1362
www.docmagic.com



Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be madeand any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations

RJ

to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial

DocMagic *ℰℱℴℛℳℐℰ* 800-649-1362
www.docmagic.com

proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Attorneys' Fees. As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

25. Jury Trial Waiver. The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

DocMagic *EFarms* 800-649-1362
www.docmagic.com

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
ROSALIE JENKINS            -Borrower
5347 SW 25 STREET, HOLLYWOOD,
FLORIDA 33023

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

Signed, sealed and delivered in the presence of:

_____
Elena Walters

_____
Jennifer Rider

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01                          Page 14 of 15

DocMagic ℰℱ⚡⚙ℼℐⅇ 800-649-1362
www.docmagic.com

─────────── [Space Below This Line For Acknowledgment] ───────────

STATE OF FLORIDA
COUNTY OF    Broward

   The foregoing instrument was acknowledged before me this    24th    day of March, 2006
by  ROSALIE JENKINS

who is personally known to me or who has produced  FLDL
as identification.                              (Type of Identification)

_____
Signature

**Elena Walters**

_____
Name of Notary

_____
Title

_____
Serial Number, if any

(Seal)

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01                                Page 15 of 15

DocMagic *800-649-1362*
www.docmagic.com

Escrow File No.: TT06-11347

## EXHIBIT "A"

Lot(s) 2, Block 50, of REVISED PLAT OF CARVER RANCHES, according to the Plat thereof, as recorded in Plat Book 21, Page(s) 8, of the Public Records of Broward County, Florida.

Property Appraiser ID#: 5142-19-02-1170

a/k/a 5347 SW 25th Street, West Park, FL, 33023

Tax ID: 11219-02-11700

CERTIFIED TO BE A TRUE AND
CORRECT COPY OF THE ORIGINAL

CFN # 105987940, OR BK 41850 Page 1117, Page 1 of 16, Recorded 04/19/2006 at
11:16 AM, Broward County Commission, Doc M: $700.00 Int. Tax $400.00 Deputy
Clerk 3300

HOb - 1347

This Instrument Prepared By:
andy Salguciro
500 Superior ave #120
Newport Bch ca 92663

FCL

After Recording Return To:
MARINERS CAPITAL, INC.
500 SUPERIOR AVE. #120
NEWPORT BEACH, CALIFORNIA 92663
Loan Number: 511045688

TurnKey Title
3696 N Federal Highway, Suite 300
Fort Lauderdale, FL 33308
(954) 745-3500

_____ [Space Above This Line For Recording Data] _____

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11,
13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)  "Security Instrument" means this document, which is dated  MARCH 24, 2006          , together
with all Riders to this document.
(B)  "Borrower" is  ROSA LEE GRIER A/K/A ROSALIE JENKINS, A SINGLE
PERSON


Borrower is the mortgagor under this Security Instrument.
(C)  "Lender" is MARINERS CAPITAL, INC.

Lender is a CALIFORNIA CORPORATION                                            organized
and existing under the laws of CALIFORNIA
Lender's address is 500 SUPERIOR AVE. #120, NEWPORT BEACH, CALIFORNIA
92663
Lender is the mortgagee under this Security Instrument.
(D)  "Note" means the promissory note signed by Borrower and dated  MARCH 24, 2006
The Note states that Borrower owes Lender TWO HUNDRED THOUSAND AND 00/100
                                          Dollars (U.S. $ 200,000.00        )
plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later
than APRIL 1, 2036
(E)  "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(F)  "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under
the Note, and all sums due under this Security Instrument, plus interest.

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01                                      Page 1 of 15

DocMagic eForms 800-649-1362
www.docmagic.com

R⋆

F3010.mtg

Case 9:21-cv-62222-BB Document 1-6 Entered on FLSD Docket 10/26/2021 Page 80 of 86

CFN # 108598735, OR BK 46209 Page 167, Page 1 of 4, Recorded 05/08/2009 at 10:25 AM, Broward County Commission, Deputy Clerk 3370

FCL

After Recording Return To:
**Security Connections, Inc.**
**595 University Boulevard**
**Idaho Falls, ID 83401**

Loan Number: 511045688 ✓

OO8100008AI
GENERAL-WELLS-SLC

——————— [Space Above This Line For Recording Data] ———————

# ASSIGNMENT OF MORTGAGE

FOR VALUE RECEIVED, the undersigned hereby grants, assigns and transfers to
OPTION ONE MORTGAGE CORPORATION, A CALIFORNIA CORPORATION

whose mailing address is    3 ADA, IRVINE, CA 92618

all of the undersigned's right, title and interest in, to and under that certain Mortgage dated
MARCH 24, 2006          executed by    ROSA LEE GRIER A/K/A ROSALIE
JENKINS, A SINGLE PERSON

, as mortgagor,
to  MARINERS CAPITAL, INC., A CALIFORNIA CORPORATION  (CFL #
01378484)                                              , as mortgagee,
and recorded either
☐ concurrently herewith; or
☐ as Instrument No. 105987940    on  04|19|2006            in book  41850   ,
page  1117      , in the Official Records in the County Recorder's office of
                                                       BROWARD    County,
FLORIDA
                                              , describing land therein as:
SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N.: 51-42-19-02-1170

TOGETHER with the note or notes therein described or referred to, the money due and to become due thereon
with interest, and all rights accrued or to accrue under said Mortgage.

FLORIDA ASSIGNMENT OF MORTGAGE/CORPORATION OR PARTNERSHIP          DocMagic eForms 800-649-1362
Page 1 of 2                                                        www.docmagic.com

Fic.Ass

Ⓐ

| Signed, sealed and delivered in the presence of:<br>Witnesses: | MARINERS CAPITAL, INC. |
|---|---|
| _____<br><br>_____ | _____<br>MICHAEL JAMES MATHISRUD<br>VICE PRESIDENT |
| STATE OF ~~FLORIDA~~ CALIFORNIA )<br> ) SS.<br>COUNTY OF ~~BROWARD~~ ORANGE )<br><br>The foregoing instrument was acknowledged before<br>me this 24th day of MARCH, 2006<br>by MICHAEL JAMES MATHISRUD<br>as VICE PRESIDENT<br>for MARINERS CAPITAL, INC. .<br><br>Signature see attached<br><br>_____<br>(Print, Type or Stamp Commissioned Name of Notary Public)<br><br>Personally known _____ or<br>Produced Identification _____<br>Type of Identification Produced: _____<br><br>My Commission expires: | _____<br><br>_____<br><br>(Seal) |
| (Affix Notarial Seal) | |

FLORIDA ASSIGNMENT OF MORTGAGE/CORPORATION OR PARTNERSHIP
Page 2 of 2

DocMagic €Forms 800-649-1362
www.docmagic.com

Flc_son

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _Orange_ } ss.

On _April 6, 2006_ before me, _Lisa Iguchi, notary public_
Date                                    Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared _Michael James Mathisrud_
Name(s) of Signer(s)

☑ personally known to me

☐ proved to me on the basis of satisfactory evidence
to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or the
entity upon behalf of which the person(s) acted,
executed the instrument.

[Notary Seal:
LISA IGUCHI
Commission # 1633266
Notary Public - California
Orange County
My Comm. Expires Dec 28, 2007]

Place Notary Seal Above

WITNESS my hand and official seal.

_[signature]_
Signature of Notary Public

──────────────── OPTIONAL ────────────────

Though the information below is not required by law, it may prove valuable to persons relying on the document
and could prevent fraudulent removal and reattachment of this form to another document.

**Description of Attached Document**
Title or Type of Document: _Assignment of Mortgage_

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| Signer's Name: _____ | Signer's Name: _____ |
|---|---|
| ☐ Individual | ☐ Individual |
| ☐ Corporate Officer — Title(s): ____ | ☐ Corporate Officer — Title(s): ____ |
| ☐ Partner — ☐ Limited ☐ General | ☐ Partner — ☐ Limited ☐ General |
| ☐ Attorney in Fact | ☐ Attorney in Fact |
| ☐ Trustee | ☐ Trustee |
| ☐ Guardian or Conservator | ☐ Guardian or Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer Is Representing: _____ | Signer Is Representing: _____ |

RIGHT THUMBPRINT OF SIGNER — Top of thumb here

© 2004 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402     Item No. 5907     Reorder: Call Toll-Free 1-800-876-6827



# United States Department of the Interior

## BUREAU OF LAND MANAGEMENT
Eastern States
7450 Boston Boulevard
Springfield, Virginia 22153

JAN 1 0 2011

TO WHOM IT MAY CONCERN;

I **HEREBY CERTIFY THAT** the attached reproduction(s) is an exact copy of the official document on file in this office.

IN **TESTIMONY WHEREOF** I have hereunto subscribed my name and caused the seal of this office to be affixed on the above day and year.

Chlis Johnson
Authorized Signature

Telephone (703)440-1600 or Fax (703)440-1609

ES 1845.1 (June 1993)

NOTICE TO THE COURT: **Counter Demand**

January 20, 2011
Circuit Court of Broward County
201 se 6th Street
Ft. Lauderdale, FL. 333011

RE: NOTICE TO THE COURTS AND ALL EMPLOYEES OF THE STATE OF
FLORIDA AND ANY OF ITS COUNTIES AND ANY OF ITS CITIES:

COUNTER-DEMAND

DEAR SIR:
YOU ARE HEREBY INSTRUCTED BY THIS CITIZEN TO PROVIDE ME WITH
THE FOLLOWING REQUIRED INFORMATION PURSUANT TO U.C.C. 3-504.4 AND
RETURN IT TO ME, IN THE ENCLOSED STAMPED ENVELOPE.

EXHIBITION OF THE INSTRUMENT THAT CREATED THE LIABILITY.
REASONABLE IDENTIFICATION OF THE PERSON MAKING PRESENTMENT AND
EVIDENCE OF HIS AUTHORITY TO MAKE IT, IF MADE FOR ANOTHER; AND,
THAT THE INSTRUMENT BE PRODUCED FOR ACCEPTANCE OF PAYMENT AT
A PLACE SPECIFIED IN IT, OR IF THERE BE NONE, AT ANY PLACE REASONABLE
IN THE CIRCUMSTANCES, AND
A SIGNED RECIEPT OF THE INSTRUMENT FOR ANY PARTIAL OR FULL
PAYMENT AND ITS SURRENDER ON FULL PAYMENT.

FAILURE TO COMPLY WITH ANY SUCH REQUIREMENTS INVALIDATES THE
PRESENTMENT. THE PERSON PRESENTING HAS A REASONABLE TIME IN
WHICH TO COMPLY AND THE TIME FOR ACCEPTANCE OR PAYMENT RUNS
FROM THE TIME OF COMPLIANCE.

*U.C.C. 3-505.5*
THE PRESENTER OR HIS AUTHORIZED AGENT MAY TREAT THE PRESENTMENT
AS DISHONORED IF THE PERSON TO WHOM THE PERSENTMENT IS MADE
ROSALIE LEE; JENKINS MAKES COUNTER-DEMANDS WHICH ARE NOT
AUTHORIZED BY U.C.C. 3-505.4 OR PLACES UNREASONABLE CONDITIONS ON
DEMANDS AUTHORIZED BY THIS SECTION.

# NOTICE OF FRAUD AND INTENT TO LITIGATE

This is my Constructive Notice to you that I have discovered extensive fraud in regard to the mortgage and transactions associated with it on certain real property as noted below. It has come to my attention that you are involved in the attempted foreclosure on my property at 5347 SW 25th Street, West Park, FL. [33023], where documented fraud has occurred. This is your **Constructive Notice** that evidence in this matter has been **personally delivered to the FBI and SECRET SERVICE,** for investigation and prosecution, resulting from violations of Federal Law including, **but not limited to,** COUNTERFEITING and CONSPIRACY TO DEFRAUD as outlined in the attached documents. Information, including your identity, and what appears to be your participation in these violations of Federal Law, has been provided to the above named Federal Agencies, and local authorities, for investigation and prosecution.

If you were not previously aware of the above mentioned fraudulent and criminal activity, and may be an innocent party in this matter, I would urge your utmost cooperation with the authorities investigating this matter as well as ceasing all of your activities relating to the ongoing foreclosure action. If, however, you would choose to move forward in ANY manner and participate in ANY way in the attempted foreclosure action referenced above, you will demonstrate your complicity and willingness to be a party to the COUNTERFEITING and CONSPIRACY TO DEFRAUD now that you have been noticed

and will become subject to potential criminal prosecution and civil litigation for damages.

    <u>You have hereby been legally noticed of this fraud and your involvement</u>, whether knowingly or unknowingly, and you therefore may make no future claim of a lack of knowledge of these criminal activities, and your participation therein, which could absolve you of liability or culpability. It is my intent to pursue any and all legal remedies against any and all participants regarding these fraudulent acts. The bonding companies of those involved will be notified of claims regarding the civil matters. Conduct yourself accordingly.

## TAKE NOTICE

This is but one part of a substantial nationwide investigation, by law enforcement, of the mortgage industry and the complicit fraud therein, and is not some "internet document" that was found and printed out and sent to you as some kind of scare tactic. This is a very real and serious matter that IS being, and WILL be, pursued with <u>all those who are identified as being complicit in any fraud</u> being prosecuted to the fullest extent of the law and civil action taken to recover damages.

**Rosalie L. Jenkins-Bey**

**Reserving All Rights**

**UCC 1-308/1-207**